No. 23-2342

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA,

PLAINTIFF-APPELLEE,

V.

DONTAE LAMONT HUNT,

DEFENDANT-APPELLANT

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

THE HONORABLE KARIN J. IMMERGUT, U.S. DISTRICT JUDGE
D.C. NO. 3:18-CR-00475-IM

_____

ANSWERING BRIEF OF PLAINTIFF-APPELLEE

_____

NATALIE K. WIGHT
UNITED STATES ATTORNEY
DISTRICT OF OREGON
**SUZANNE MILES**
CRIMINAL APPELLATE CHIEF
ASSISTANT UNITED STATES ATTORNEY
1000 SW 3RD AVENUE, SUITE 600
PORTLAND, OREGON 97204
TELEPHONE: (503) 727-1000
ATTORNEYS FOR PLAINTIFF-APPELLEE

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... v

INTRODUCTION ................................................................................................... 1

STATEMENT OF JURISDICTION .................................................................... 1

STATEMENT OF ISSUES .................................................................................. 2

STATEMENT OF FACTS .................................................................................... 2

    A.    2017 Shooting in Eugene, Oregon .................................................. 2

    B.    2018 Federal Drug Investigation ................................................... 4

    C.    Federal Search Warrants ................................................................. 5

        1.    Federal Tracking and Geolocation Warrants ................... 6

        2.    Premises Warrant ...................................................................... 8

            a.    Eugene Shooting ........................................................ 9

            b.    Defendant's Criminal History .................................. 9

            c.    AH ................................................................................... 9

            d.    Walmart Wire Transfers ............................................ 9

            e.    Rental Cars ................................................................. 10

            f.    Surveillance and Counter-Surveillance ............... 10

            g.    Second Confidential Informant ............................. 10

        3.    Motions to Suppress ............................................................. 11

            a.    March 2020 Suppression Motion .......................... 11

b. February 2022 Suppression Motion ...................................... 13

c. May 2022 Suppression Motion .............................................. 15

SUMMARY OF ARGUMENT ................................................................... 17

ARGUMENT ................................................................................................ 19

I. The July 5 state geolocation warrant was not relevant to defendant's federal trial and the district court correctly denied defendant's *Franks* and suppression motions raised against the federal warrants .......................... 19

A. Standards of Review ................................................................ 19

B. The July 5, 2018, state warrant had no role in the federal investigation ............................................................................. 19

C. The district court correctly denied defendant's *Franks* hearing request and motion to suppress the evidence found in his premises ................... 20

II. The court properly denied defendant's motion to suppress the evidence found on his black iPhone ............................................................................. 25

A. Standards of Review ................................................................ 25

B. Defendant retained minimal property interest in his abandoned black iPhone ................................................................................. 25

1. Defendant abandoned the black iPhone ......................................... 26

2. Because he abandoned the black iPhone, defendant had no standing to suppress the evidence found on it ................. 29

3. The delay between Eugene police seizing the phone and federal officers searching it was not unreasonable and does not merit suppression ....................................................... 30

4. The officers acted in good faith ....................................... 33

III. The district court approximated the quantity of fentanyl analogue that defendant trafficked based an appropriate method and proven facts ............. 34

    A.    Standards of Review .................................................................................. 34

    B.    Defendant's Drug Quantity Computation ..................................... 35

    C.    The court properly relied on the tested sample to approximate the weight of fentanyl analogue ................................................................. 37

IV. Defendant's prior convictions for Oregon delivery of a controlled substance are ACCA predicates ............................................................. 42

    A.    Standard of Review ................................................................................. 42

    B.    Defendant has three prior serious drug offenses ..................................... 42

        1.    Oregon DCS necessarily entails drug distribution conduct .......... 43

        2.    *State v. Self* ................................................................................. 44

        3.    Other circuits agree that brokering is distribution conduct .......... 45

        4.    *Sandoval v. Sessions*'s hard line on solicitation is not the issue here ................................................................................. 47

V. The district court exercised sound discretion in denying defendant's recusal motion ..................................................................................... 49

    A.    Standard of Review ................................................................................. 49

    B.    Background Facts .................................................................................. 49

    C.    Defendant did not have the right to a different judge ............................. 50

VI. Defendant's felon in possession of a firearm conviction is constitutional as applied to him ........................................................... 55

    A.    Standard of Review ................................................................................. 55

B.    Defendant's convictions under 18 U.S.C. § 922(g)(1) are
      constitutional under binding precedent ........................................................ 55

C.    Section 922(g)(1) meets the *Bruen* test ............................................................ 56

CONCLUSION ........................................................................................................... 60

STATEMENT OF RELATED CASES ............................................................................ 61

CERTIFICATE OF COMPLIANCE ............................................................................. 62

# TABLE OF AUTHORITIES

## Cases

*Blanton v. City of North Las Vegas*, 489 U.S. 538 (1989) ........................................ 56

*Blockburger v. United States*, 284 U.S. 299 (1932) .................................................. 48

*Branzburg v. Hayes*, 408 U.S. 665 (1972) ................................................................ 56

*California v. Hodari D.*, 499 U.S. 621 (1991) ......................................................... 27

*Clemens v. U.S. Dist. Ct.*, 428 F.3d 1175 (9th Cir. 2005) ....................................... 51

*Cortes-Maldonado v. Barr*, 978 F.3d 643 (9th Cir. 2020) ....................................... 44

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................................... 57–58

*Elkins v. United States*, 364 U.S. 206 (1960) ...................................................... 31–32

*Franks v. Delaware*, 438 U.S. 154 (1978) ............................................... 2, 12, 16–24

*Gravenmier v. United States*, 469 F.2d 66 (9th Cir. 1972) ...................................... 54

*In re Bernard*, 31 F.3d 842 (9th Cir. 1994) ............................................................. 55

*Kaley v. United States*, 571 U.S. 320 (2014) ........................................................... 23

*Liteky v. United States*, 510 U.S. 540 (1994) ...................................................... 51, 54

*Herring v. United States*, 555 U.S. 135 (2009) .................................................... 33–34

*Hudson v. Michigan*, 547 U.S. 586 (2006) .............................................................. 33

*Lewis v. United States*, 518 U.S. 322 (1996) ........................................................... 56

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019) ............................................... 58

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) ................ 55–58

*Riley v. California*, 573 U.S. 373 (2014) ..............................................29–30

*Sandoval v. Sessions*, 866 F.3d 986 (9th Cir. 2017)......................................43, 45, 47

*Segura v. United States*, 468 U.S. 796 (1984)......................................... 31

*Shular v. United States*, 140 S. Ct. 779 (2020) ......................43–44, 46–47, 49

*State v. Hubbell*, 314 Or. App. 844 (2021) .......................................... 47

*State v. Kimbrough*, 285 Or. App. 84 (2017) ..................................... 47

*State v. Self*, 75 Or. App. 230 (1985).......................................44–45, 48

*United States v. Ahumada-Avalos*, 875 F.2d 681 (9th Cir. 1989)................................. 43, 48

*United States v. Angulo-Lopez*, 791 F.2d 1394 (9th Cir. 1986) .......................................... 23

*United States v. Arnpriester*, 37 F.3d 466 (9th Cir. 1994)...................................... 52

*United States v. Barton*, 995 F.2d 931 (9th Cir. 1993)........................................ 15

*United States v. Brewster*, No. 23-329, _ F.4th _, 2024 WL 4157759 (9th Cir. Sept. 12, 2024) .................................................. 30

*United States v. Bynum*, 669 F.3d 880 (8th Cir. 2012) .......................................... 46

*United States v. Chi Mak*, 683 F.3d 1126 (9th Cir. 2012). ..................................... 55

*United States v. Christie*, 717 F.3d 1156 (10th Cir. 2013)..................................... 33

*United States v. Clark*, 49 F.4th 889 (5th Cir. 2022) .......................................... 46

*United States v. Cooley*, 1 F.3d 985 (10th Cir. 1993) .......................................... 51

*United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008)...................................... 24

*United States v. Culps*, 300 F.3d 1069 (9th Cir. 2002)........................................ 37

*United States v. Davenport*, 519 F.3d 940 (9th Cir. 2008) ...................................................... 48

*United States v. Dorsey*, 105 F.4th 526 (3rd Cir. 2024) ........................................................ 57

*United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024) ........................................................ 55

*United States v. Duarte*, 108 F.4th 786 (9th Cir. 2024) ........................................................ 55

*United States v. Fannin*, 817 F.2d 1379 (9th Cir. 1987) ........................................................ 23

*United States v. Fields*, 53 F.4th 1027 (6th Cir. 2022) .......................................................... 46

*United States v. Fernandez*, 388 F.3d 1199 (9th Cir. 2004) ................................................... 23

*United States v. Fisher*, 56 F.4th 673 (9th Cir. 2022) ........................................................ 26–30

*United States v. Gay*, 98 F.4th 843, 847 (7th Cir. 2024) ....................................................... 57

*United States v. Hall*, 113 F.3d 157 (9th Cir. 1997) .......................................................... 23–24

*United States v. Holland*, 519 F.3d 909 (9th Cir. 2008) ............................................... 50–51, 54

*United States v. Jimenez-Shilon*, 34 F.4th 1042 (11th Cir. 2022) .......................................... 58

*United States v. Jobe*, 933 F.3d 1074 (9th Cir. 2019) .......................................................... 34

*United States v. Kilby*, 443 F.3d 1135 (9th Cir. 2006) ...................................................... 36–37

*United States v. Laist*, 702 F.3d 608 (11th Cir. 2012) ......................................................... 31

*United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009) .................................................... 58

*United States v. McCutchen*, 992 F.2d 22 (3d Cir. 1993) ..................................................... 38

*United States v. McElmurry*, 776 F.3d 1061 (9th Cir. 2015) ................................................. 48

*United States v. McTiernan*, 695 F.3d 882 (9th Cir. 2012) ................................................... 49

*United States v. Meek*, 366 F.3d 705 (9th Cir. 2004) .......................................................... 24

*United States v. Nordling*, 804 F.2d 1466 (9th Cir. 1986) ..............................25–27

*United States v. Norris*, 942 F.3d 902 (9th Cir. 2019)..................................... 19, 24

*United States v. Penn*, 63 F.4th 1305 (11th Cir. 2023) ....................................45–46

*United States v. Perez-Garcia,* 96 F.4th 1166 (9th Cir. 2024)..........................57–58

*United States v. Prentice*, 956 F.3d 295 (5th Cir. 2020) ..................................45–46

*United States v. Rahimi*, 144 S. Ct. 1889 (2024) .............................................58–59

*United States v. Reeves*, 210 F.3d 1041 (9th Cir. 2000) ................................... 21, 24

*United States v. Ruiz,* 758 F.3d 1144 (9th Cir. 2014) ........................................... 23

*United States v. Scheele*, 231 F.3d 492 (9th Cir. 2000)..............................34, 38, 41

*United States v. Silver*, 245 F.3d 1075 (9th Cir. 2001) .....................................52–54

*United States v. Sullivan*, 797 F.3d 623 (9th Cir. 2015).............................25, 31–32

*United States v. Terabelian*, 105 F.4th 1207 (9th Cir. 2024) ................................ 28

*United States v. Tucker*, 821 F. App'x. 659 (8th Cir. 2020).................................. 46

*United States v. Vickers*, 540 F.3d 356 (5th Cir. 2008)........................................ 46

*United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010)..................................... 55

*United States v. Walker*, 953 F.3d 577 (9th Cir. 2020) ........................................ 42

*United States v. Whindleton*, 797 F.3d 105 (1st Cir. 2015) .................................. 46

*United States v. Yang*, 958 F.3d 851 (9th Cir. 2020)............................................ 19

**Statutes**

18 U.S.C. § 207.................................................................................................... 52

18 U.S.C. § 922.................................................................................... 2, 7, 19, 55–60

18 U.S.C. § 924.................................................................................. 1, 18, 42–50, 60

18 U.S.C. § 1956 ..................................................................................................... 7

18 U.S.C. § 3500 ................................................................................................... 15

18 U.S.C. § 3553 ................................................................................................... 53

21 U.S.C. § 802...................................................................................................... 47

21 U.S.C. § 841......................................................................................... 35, 42–43, 49

21 U.S.C. § 846.................................................................................................... 7, 35

28 U.S.C. § 455...............................................................................................50–52, 55

## Sentencing Guidelines

USSG § 2D1.1........................................................................................................ 35

## Secondary Sources

Akhil Reed Amar, *The Bill of Rights* 48 (1998)..................................................... 58

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (1868) .................................... 57

## INTRODUCTION

Defendant Dontae Hunt has made a career out of drug dealing and gun possession. In the early 2000s, he sold crack cocaine. In 2018, less than a year after getting out of prison for those crimes, defendant jumped into the opioid epidemic, selling counterfeit oxycodone pills pressed with fentanyl analogues.

After one mistrial, COVID-related delays, the aid of four appointed defense attorneys, several rounds of suppression motions, and a retrial, a jury convicted defendant of conspiracy to possess and traffic cocaine and fentanyl analogue, drug distribution, two counts of being a felon in possession of a firearm, and two counts of money laundering. 1-ER-2.

Although the government seized only a small fraction of the counterfeit pills that defendant trafficked, there was enough evidence to support the district court using the seized pills as representative of his product. The court held him responsible for selling pills containing fentanyl analogues, and it sentenced defendant as an Armed Career Criminal under 18 U.S.C. § 924(e). He is currently serving a 300-month sentence. 1-ER-3.

## STATEMENT OF JURISDICTION

The government agrees with defendant's jurisdiction statement.

# STATEMENT OF ISSUES

## SEARCH ISSUES

1. Did the district court correctly deny defendant's motions for *Franks* hearings and to suppress drugs, guns, and other evidence found in the homes of two of his girlfriends?

2. Did the court correctly deny defendant's motion to suppress evidence found on the black iPhone that he dropped and abandoned after being shot by an assailant?

## SENTENCING ISSUES

3. Did the district court calculate defendant's sentencing guidelines correctly based on the evidence adduced at trial that defendant trafficked counterfeit oxycodone pills constituting more than 300 grams of fentanyl analogue?

4. Did defendant's prior Oregon controlled substance convictions qualify him as an Armed Career Criminal?

## MISCELLANEOUS ISSUES

5. Did the district court exercise sound discretion in denying defendant's recusal motion?

6. Is 18 U.S.C. § 922(g)(1) constitutional as applied to defendant?

# STATEMENT OF FACTS

A multi-agency federal investigation into counterfeit oxycodone trafficking led federal agents to defendant's drug and money laundering crimes. Around the same time, he also caught local police attention as the victim of a shooting.

## A. 2017 SHOOTING IN EUGENE, OREGON

In December 2017, defendant was shot multiple times as he walked through the parking lot of an apartment building in Eugene, Oregon. 1-ER-33. The shooter

fled the scene. *Id.* The incident was partially caught on a security camera. 3-SER-594.

Before the shots, defendant was walking across the parking lot apparently talking on a cellphone and carrying a light-colored bag slung across his shoulder.



*Id.* at 594–95. After being shot, defendant stumbled off camera.

Rylie Jones, defendant's girlfriend who was with him at the scene, grabbed defendant's bag and stashed it in the trunk of his car. 1-ER-33. The video does not show what happened to defendant's phone. 3-SER-594.

A few minutes later, a friend picked up Jones and defendant. 1-ER-33. Jones went back to defendant's trunk, retrieved his bag, and took it with them. *Id.* The women dropped defendant off at the hospital and left. *Id.*

Eugene police investigated. *Id.* at 33–34. One officer tried to interview defendant at the hospital, but he refused to cooperate. *Id.* at 34. The officer seized a white iPhone from defendant's pants pocket. *Id.* Eugene officers stopped Jones and her friend as they drove away from the hospital. *Id.* at 33. They seized two loaded

3

guns from defendant's bag, which Jones still had with her. *Id.* The seizures of the white iPhone and the guns are not challenged on appeal.

Eugene police also searched the parking lot where the shooting happened. *Id.* They found blood, bullet fragments, a spent shell casing, and a black iPhone lying on the ground near a bush. *Id.* They seized the phone along with two sets of keys found nearby. *Id.* Everything—including the white and black iPhones—was logged into evidence by the Eugene Police Department as part of the shooting investigation. *Id.* at 34.

### B. 2018 FEDERAL DRUG INVESTIGATION

In June 2018, FBI, IRS's Criminal Investigation Division, DEA, and Portland Police Bureau collaborated on a drug trafficking investigation focused on counterfeit oxycodone pills laced with fentanyl. 1-ER-34. That investigation led to one of defendant's cellphone numbers ("Hunt-1751"). 2-ER-158; 2-SER-338.

A Portland police officer investigating a counterfeit oxycodone overdose death found himself on a different path that also led to defendant. 1-ER-56. That officer found and interviewed the overdose victim's drug source ("AH").[1] *Id.* AH identified

---

[1] The nomenclature used to identify this confidential source was inconsistent between warrants and court documents. Defendant refers to the informant by name in his brief. As a matter of practice, the government will use the informant's initials in this public filing but will also note what the informant was called in the source document being cited to ease cross-references to the record.

defendant as one of her oxycodone suppliers and gave officers his phone number ("Hunt-5114"). *Id.*; PSR ¶ 20.

Based, in part, on AH's information, on July 5, 2018, Portland police applied for a state warrant to get geolocation data for Hunt-5114. 2-ER-139–52 (all references to AH are on 2-ER-148 and are redacted). No data from the state warrant was used in the federal investigation.

### C.   FEDERAL SEARCH WARRANTS

Between July 19, 2018, and January 9, 2020, the two lead federal investigators—FBI Task Force Officer Scott McCollister and IRS-CI Special Agent Scott McGeachy—obtained 29 federal search warrants for property and data associated with defendant. Those federal warrants are listed here:

| Date | Warrant | Type |
|---|---|---|
| July 19, 2018 | 18-MC-612 | Phone Geolocation Hunt-1751 |
| ~~Aug. 10, 2018~~ | ~~18-MC-694~~ | ~~Tracker; Pickup Truck~~ (*not executed*) |
| Aug. 22, 2018 | 18-MC-771 | Phone Geolocation Hunt-1751 |
| Aug. 23, 2018 | 18-MC-779 | Tracker; Pickup Truck |
| Sept. 21, 2018 | 18-MC-771-EXT | Phone Geolocation Hunt-1751 |
| Sept. 25, 2018 | 18-MC-894 (A-D) | Premises |
| Sept. 27, 2018 | 18-MX-894-E | Infiniti |
| Oct. 12, 2018 | 18-MC-936 (A-K) | Seized Phones – Dekum |
| Oct. 16, 2018 | 18-MC-945 | Buccal Swabs – DNA |
| Dec. 14, 2018 | 18-MC-1081(A-B) | Seizure Warrants – Bank Accounts |
| June 12, 2019 | 19-MC-502 | Seized Phone (McIntosh) |
| Dec. 13, 2019 | 19-MC-1066 | Seized Phone from Dekum Residence |

| Date | Warrant | Type |
|------|---------|------|
| Jan. 9, 2020 | 20-MC-22- (A-C) | Seized Phones (Eugene Shooting) |

The September 25 premises warrants yielded drug, firearm, and financial record evidence that the government used at trial. The first three geolocation and tracker warrants (shaded in gray) helped federal investigators surveil defendant, and some of that surveillance was used in the premises warrant application. *See, e.g.*, 2-ER-243–46, 1-ER-18–19 (discussing interplay of tracking information and surveillance).

Defendant's suppression motions in district court focused on mistakes in those first three federal warrants. Those warrant applications included AH identifying defendant as a drug dealer. 2-ER-161; 2-ER-174 (incorporating earlier application). They omitted AH's criminal history, which included a crime of dishonesty. *Id.* Defendant argued that those omissions were material, and that any evidence obtained from those initial warrants must be suppressed. 1-ER-12–13.

None of the federal warrants referenced any information derived from the state's July 5 geolocation warrant for Hunt-5114 that defendant challenges for the first time on appeal.

### 1. Federal Tracking and Geolocation Warrants

The first federal warrant application—submitted on July 19, 2018—sought geolocation data for Hunt-1751. The warrant application was based on probable cause that the phone's geolocation data would provide evidence of violations of

18 U.S.C. § 922(g) (felon in possession of a firearm), 21 U.S.C. § 846 (drug trafficking conspiracy), and 18 U.S.C. § 1956 (money laundering), or information leading to such evidence. 2-ER-159.

In support of that application, Officer McCollister provided facts about the December 2017 shooting in Eugene, including that Eugene officers recovered two firearms from a tan Gucci shoulder bag during the traffic stop of Rylie Jones. 2-ER-160.

The affidavit also recounted information that AH gave to Portland police:

> . . . Portland Police [Officer] Sean Macomber interviewed a Confidential Source ([AH]) regarding an individual selling oxycodone pills in the Portland metropolitan area. [AH] told Officer Macomber that Donte HUNT, whom [AH] knows personally, is selling large quantities of oxycodone and counterfeit oxycodone pills. Officer Macomber obtained a Multnomah County Sheriff's Office booking photo of Donte Lamont HUNT. Officer Macomber showed the photograph to [AH] and [AH] positively identified the person depicted in the photo as the person known to [AH] as Donte HUNT.
>
> [AH] is providing information for consideration on pending drug related charges.

1-ER-161 (calling AH "Confidential Source (CS)"). The affidavit did not include "that [AH] had multiple prior arrests and some convictions on misdemeanor drug related charges and other misdemeanor crimes. [AH] has been convicted for

7

misdemeanor providing false identification to law enforcement to avoid arrest." 2-ER-214.

Agents secured the three shaded warrants—two geolocation warrants for Hunt-1751 and a tracker warrant for defendant's car—using the block quote above. 2-ER-170; 2-ER-187. The agents caught their omission of AH's criminal history, noted their mistake, and added the criminal history blurb quoted above in the September 21, 2018, geolocation extension application. 2-ER-214. All subsequent warrant applications, including the September 25 premises warrant, included that criminal history. *See, e.g.*, 2-ER-239.

### 2. Premises Warrants

On September 25, 2018, investigators secured warrants to search three premises associated with defendant—on NE Dekum Street, SW Canyon Road, and N Watts Street. 2-ER-227–29. In the Dekum Street house, agents found 49 counterfeit oxycodone pills, drug packaging and a scale, $3,930 in cash, numerous cellphones, and three pistols, two of which were stolen. 2-ER-264. Agents found $36,000 in a shoebox in the Watts Street home, which the resident said that defendant gave her. 2-ER-288. Nothing of evidentiary value was found in the Canyon Road home. 2-ER-282. Defendant sought to suppress evidence from the Dekum and Watts residences.

The probable cause statement supporting these premises warrant applications contained the following information:

### a. Eugene Shooting

The affiant summarized the shooting event, largely in line with the July 19 federal geolocation warrant. 2-ER-237–38.

### b. Defendant's Criminal History

Defendant had 1999 and 2001 state felony drug-trafficking convictions and a 2004 federal drug-trafficking conviction.

### c. AH

This application included the information provided by AH[2] linking defendant to Hunt-5114 and identifying him as a source of counterfeit oxycodone pills. 2-ER-238–39. Phone records corroborated that defendant and AH were in contact. 2-ER-239. And it included her criminal history summary. *Id.*

### d. Walmart Wire Transfers

Between August 2017 and July 2018, Defendant receive almost $20,000 in Walmart money transfers spread over 16 transactions from five different senders. 2-ER-239–41. The affiant explained that drug dealers commonly transfer drug proceeds via Walmart or Western Union because most banks no longer allow third party depositors to deposit cash into a bank account. 2-ER-41. "As a result people

---

[2] AH is referred to as "Cooperating Defendant" (CD) in this affidavit. 2-ER-238.

9

laundering money have increased their use of money transfer agencies like Wal-Mart."

*Id.*

### e. Rental Cars

Rental car records showed that the mother of defendant's child, who lived at the Dekum residence, rented seven cars in four months, despite owning a new car herself. 2-ER-241–42. The affiant stated that using multiple rental cars and straw renters is also common practice for drug traffickers to "conceal and disguise their activity from law enforcement." 2-ER-242.

### f. Surveillance and Counter-Surveillance

The application reported details of defendant's observed travel and behavior between July and August 2018 that was consistent with drug-trafficking practices. 2-ER-243–46; 2-ER-248–53; 2-ER-254–55.

### g. Second Confidential Informant

A second informant, who had given confirmed information to police before, reported that "Donte HUNT is distributing large quantities of counterfeit pills, primarily pressed with fentanyl" and that defendant "also distributes cocaine." 2-ER-253. The informant identified Hunt-5114 as defendant's phone number and believed "HUNT maintains a stash location where HUNT stores HUNT's drugs. . . . [He] also stores cash at residences belonging to female acquaintances." 2-ER-253–54.

The affiant reported this informant's prior felony drug and weapons convictions and that he was seeking consideration on then-pending drug charges. 2-ER-253. This informant was not acquainted with AH. 2-ER-254.

### 3. MOTIONS TO SUPPRESS

In the four years between indictment and jury verdict, defendant's attorneys filed four suppression motions, which were heard—and denied—by two district judges. 4-ER-790, 796, 799, 802 (ECF Nos. 56, 137, 176, 221). Relevant to defendant's appeal are suppression motions he filed in March 2020 (premises), February 2022 (iPhones), and May 2022 (renewed premises motion).[3] None of those motions raised the state's July 5 warrant.

### a. March 2020 Suppression Motion

Defendant was arraigned in October 2018. 4-ER-786 (ECF No. 7). After six continuance motions, he filed his first suppression motion in March 2020. 4-ER-787–90 (ECF Nos. 13, 16, 22, 25, 29, 37, 49).[4]

That motion sought to suppress the evidence found in the Dekum and Watts residences as fruit of the allegedly defective July 19 federal geolocation warrant. 1-

---

[3] He also moved to suppress the guns found in the seized Gucci bag. 4-ER-796 (ECF Nos. 137–38). Defendant does not appeal the denial of that motion. 4-ER-797 (ECF No. 160).

[4] The final amended version is at ECF No. 56. 1-SER-2.

SER-2. According to the motion, the July 19 warrant "failed to establish probable cause," and each successive warrant "relied upon the affidavits and fruits of the warrant executed before." *Id.* Defendant also sought a *Franks* hearing, based in relevant part, on the omission of AH's criminal history. *Id.* at 24.

At the October 6, 2020, hearing, Hon. Michael W. Mosman denied the motion. The court held, "I have enough information here to decide that the premises warrants are grounded in probable cause independent of any of the issues—that is, the *Franks* or straight-up motion to suppress issues—that were raised with regard to the geolocation and tracking warrants." 1-ER-30.

Contrary to defendant's characterization, the court went piece-by-piece through the information supporting the premises searches and culled out anything derived from the geolocation and tracking warrants. 1-ER-14–30; Def. Op. Br. at 36. What was left was defendant's drug-trafficking history, the Eugene shooting incident, the information provided by the second informant, the Walmart money transfers, defendant's use of multiple cellphone numbers and rental cars—and the affiant's explanation of that behavior. That, the court held, was enough to establish "probable cause for . . . the premises warrants and a nexus to the locations themselves totally independent of . . . the earlier warrants." 1-ER-30.

12

### b.      February 2022 Suppression Motion

This case was reassigned to Hon. Karin J. Immergut in July 2021, after Judge Mosman took senior status.  4-ER-797 (ECF No. 162).

Defendant filed another motion to suppress in February 2022.  1-SER-51. That motion sought to suppress evidence found on two phones seized by Eugene police after the shooting—the black iPhone found on the ground at the crime scene and the white iPhone taken from defendant's pocket at the hospital.  *Id.*  Eugene police retained those phones from December 2017 until they were seized by federal agents and searched pursuant to a federal search warrant issued on January 9, 2020. 1-ER-34.

The court held a hearing and denied the motion in a written order.  3-ER-454– 563; 1-ER-32.  No evidence was found on the white phone from defendant's pocket, so the court denied that part of the motion as moot.  1-ER-36.

The court held that defendant voluntarily abandoned the black iPhone that he dropped after being shot, divesting him of standing to challenge its seizure and search. 1-ER-37.  The court found that the "officers found the black iPhone on the ground at the scene of the shooting" and "[i]t was not clear to the officers to whom the cell phone belonged."  *Id.*  In contrast to the care taken over defendant's guns—his girlfriend secured the Gucci bag in defendant's car trunk, retrieved it before taking

13

defendant to the hospital, and kept it with her after dropping him off—"no one at the scene . . . made any apparent effort to secure the black iPhone." 1-ER-38.

The court did not credit defendant's claim that he was not told that the Eugene police had the phone. "The evidence is clear . . . that Defendant was on notice that the Eugene Police Department was investigating the shooting and seized evidence related to it from the crime scene." *Id.*

In the alternative, the court denied the motion because there was no unreasonable delay. 1-ER-39–43. Even if defendant retained a possessory interest in the black iPhone, it was weak. "Defendant never once—until the instant suppression motion—sought to assert a possessory interest in the black iPhone," which "weigh[s] against a finding that any delay was unreasonable." 1-ER-40. On the other hand, "[t]he Government certainly has a real and substantial interest in investigating drug trafficking, including seizing and searching cellphones and other modes of communication belonging to alleged drug traffickers." 1-ER-41.

Finally, the court evaluated the length of delay. Disagreeing with defendant, the court found "the delay is not fairly depicted as 768 days." *Id.* With no identified owner, the court held that it was not unreasonable for the Eugene Police to retain the phone. 1-ER-41–42.

The operative period for the Fourth Amendment analysis was the weeks between when the federal investigators developed probable cause that the phone

14

contained drug trafficking evidence and when they searched it. 1-ER-42. The court found that the government acted "diligently and promptly" in that time and denied defendant's motion. *Id.*

### c. May 2022 Suppression Motion

Before defendant's first trial, but after his October 2020 suppression hearing, the government produced more information about AH with its *Jencks* disclosures. 18 U.S.C. § 3500 (requiring production of prior statements by and other impeachment materials for testifying witnesses). This included transcripts of AH's two post-arrest interviews with Portland police, her full criminal history, and some of her call and text records. 5-ER-818–904.[5]

In the lead-up to his retrial, and with Judge Immergut's leave, defendant filed a second motion to suppress the evidence found under the premises warrants. 4-ER-802 (ECF No. 221); 4-ER-801 (ECF No. 215). This motion reiterated defendant's complaints that the first three federal warrants left out AH's criminal history details. But it also raised new arguments.

---

[5] In later proceedings, the government agreed that it should have produced these materials in advance of the suppression hearing, rather than viewing them only as *Jencks* materials. *See United States v. Barton*, 995 F.2d 931, 934–35 (9th Cir. 1993) (extending *Brady*'s production rules to evidence that would "impeach material allegations in an affidavit for a search warrant."). The government raised no objection to allowing defendant to file a renewed suppression motion.

The September 25 application included that blurb quoted above (*supra* p. 7) about AH's criminal history, but defendant argued that that was not enough. 1-SER-70. He said that the premises warrant application still omitted critical reliability information, specifically, information: (1) tending to show that AH had multiple drug suppliers (not just defendant) and was engaged in prostitution activity; (2) about two misdemeanor convictions and other arrests for obstruction-related conduct; and (3) about AH's "pattern of deception" in her post-arrest statements to police during which she identified defendant. 1-ER-59.

The court denied this motion too. 1-ER-55. It ruled, "Defendant has not met his burden of proof for a hearing under *Franks*." 1-ER-61. "The officer was not obligated to provide a detailed recitation of CD's interview with investigators or each of CD's misdemeanor arrests and convictions . . . [b]ecause this information would not have affected a reasonable magistrate's evaluation of the affidavit," therefore, the court did "not find the officer acted intentionally, knowingly, or recklessly" based on the record before it. 1-ER-62.

Even if the information was intentionally omitted, the court ruled, it would not have tipped the probable-cause scale. The disclosed information about AH's false identification conviction, her prior drug crimes, and her seeking consideration on pending charges "are significantly more inculpatory than the omitted information and sufficiently apprised the magistrate of the issues with [AH]'s credibility." 1-ER-64.

16

The court disagreed that AH's interview transcripts showed a "propensity for 'lies and manipulation.'" *Id.* AH reluctantly cooperated but, given her expressed "intense fear" of defendant, the court found that a "reasonable magistrate would more likely have concluded that [AH]'s initial equivocation was the result of [AH]'s fear of Defendant—not a propensity to tell lies." *Id.* Taken with the corroborating evidence from the second informant, the court held that the magistrate had enough to weigh AH's information. *Id.*

Alternatively, like Judge Mosman, Judge Immergut held that "[e]ven if the omitted information undermined [AH]'s credibility such that [AH]'s statements should have been excised from the probable cause analysis, there would still have been substantial evidence from which a magistrate judge could have concluded there was probable cause for the premises warrant." 1-ER-64–65.

Defendant proceeded to trial, was convicted of all but one charged count, and was sentenced to 300 months' imprisonment.[6] This appeal followed.

**SUMMARY OF ARGUMENT**

Defendant's two suppression arguments—about the search of his premises and the black iPhone found at the Eugene shooting scene—are each markedly misaimed.

---

[6] The jury acquitted defendant of Count Five: possession of a firearm in furtherance of a drug trafficking crime. 1-ER-2.

For the first time on appeal, he challenges a July 5 state warrant that played no role in the federal investigation. His arguments parrot what he did raise below—alleging material omissions about AH's background in the *federal* search warrant applications—and those motions were properly denied.

Similarly, defendant and amicus spend pages arguing that the abandonment doctrine does not allow officers to search a discarded cellphone. That is beside the point in this case. Agents secured a federal warrant before searching the contents of defendant's black iPhone. The only question is whether the state officers held on to the phone for too long before that warrant issued, but the district court's abandonment finding disposes of that.

Defendant's two sentencing arguments also do not merit relief. The district court properly approximated the quantity of fentanyl analogue defendant trafficked, based on the trial evidence. And the court correctly held that an Oregon delivery of a controlled substance conviction is a predicate "serious drug offense" for the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). Even the least culpable conduct captured under Oregon's law—brokering a drug deal—"necessarily entails" drug distribution conduct.

Finally, the court exercised sound discretion denying defendant's recusal demand. Although the judge served as U.S. Attorney at the time of defendant's prior federal sentencing, she was not involved in the underlying case and that prior

conviction played a minimal role in defendant's current matter. And 18 U.S.C.

§ 922(g)(1) is constitutional as applied to defendant.

## ARGUMENT

### SEARCH ISSUES

I. **The July 5 state geolocation warrant was not relevant to defendant's federal trial and the district court correctly denied defendant's *Franks* and suppression motions raised against the federal warrants.**
(Defendant's Argument II)

#### A. Standards of Review

This Court reviews de novo a district court's refusal to conduct a *Franks*

hearing. *United States v. Norris*, 942 F.3d 902, 907 (9th Cir. 2019); *Franks v. Delaware*,

438 U.S. 154 (1978). Motions to suppress are also reviewed de novo. *United States v.*

*Yang*, 958 F.3d 851, 857 (9th Cir. 2020). The trial court's underlying factual findings

are reviewed for clear error. *Id.*

#### B. The July 5, 2018, state warrant had no role in the federal investigation.

For the first time on appeal, defendant attacks the state's July 5, 2018,

geolocation warrant for failing to disclose AH's credibility issues and he faults the

government for not bringing the state warrant to the court's attention. Def. Op. Br.

at 34–36. His argument is mistargeted.

The state's July 5 warrant was not "the lynchpin of the government's

investigation." Def. Op. Br. at 35. No federal search warrant referenced any data or

19

information derived from that warrant. *See, e.g.*, 2-ER-159–63 (July 19 federal geolocation warrant); 2-ER-237–61 (federal premises warrant).

Defendant paints a picture of a government cover-up, complaining that he got the state's warrant too late to challenge it. *See, e.g.*, Def. Op. Br. at 35–37. It is true that the state warrant was produced in a batch of discovery that issued three weeks after defendant filed his first suppression motion. Def. Op. Br. at 11. But that was three weeks before he filed his reply brief on that first motion, six months before oral argument, and a full two years before he filed his final suppression motion—which took a second bite at the AH apple. 4-ER-791–801 (ECF Nos. 75, 81, 251).

There was no cover-up. No one talked about the state search warrant—not any of his four trial-level attorneys or the government—because there was (and still is) nothing to talk about. Its existence does not make it material. *See Franks*, 438 U.S. at 155–56 (defining materiality to include only information that affects the quantum of probable cause).

## C. The district court correctly denied defendant's *Franks* hearing request and motion to suppress the evidence found in his premises.

Defendant's complaints on appeal about the state's July 5 warrant—that it omitted adverse credibility information about AH—echo his arguments against the federal premises warrants below. The district court correctly denied his *Franks* hearing requests and his suppression attempts because the premises warrant fixed the

20

AH omission and, even excising AH's statements and their fruit, that application established probable cause.  1-ER-30; 1-ER-64–65.

To be "entitled to an evidentiary hearing on the validity of the affidavit underlying a search warrant" a defendant must make a "substantial preliminary showing that (1) the affidavit contains intentionally or recklessly false statements or misleading omissions, and (2) the affidavit cannot support a finding of probable cause without the allegedly false [or misleading] information."  *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000).  Because each judge concluded that defendant failed on the second prong, and Judge Immergut further found no evidence of deliberate or reckless omission, no *Franks* hearing was needed.

Both judges assumed fault in the first three federal warrants.  They evaluated the premises affidavit after excising AH's statements and all evidence derived from the geolocation data and tracking information collected from those initial warrants— including surveillance of defendant that may have been aided by the location data.  1-ER-30; 1-ER-64–65.

Without any of that, the government still had evidence that:

- defendant had a history of drug dealing dating back 20 years, resulting in both state and federal convictions, 2-ER-236;

- he was shot in Eugene while carrying a bag with two guns of his own and he refused to cooperate with police to investigate the shooter, 2-ER-237;[7]

- he had close to $20,000 in Walmart money transfers over an eleven-month period with no legitimate income explanation, 2-ER-239–41;

- he gave Walmart his Hunt-1751 phone number, which was subscribed to him at the Dekum Street residence, 2-ER-241;

- a second informant (not AH) identified defendant as a source of "large quantities of counterfeit pills, primarily pressed with fentanyl," independently identified Hunt-5114 as defendant's phone number, and reported that defendant used the homes of "female acquaintances" to store cash, 2-ER-253–54;

- both the Dekum Street and Watts Street residences were home to female acquaintances of defendant—the mother of his child lived at Dekum, and the Watts residence belonged to a woman who was "one of the most frequent callers in the Hunt-1751 phone" toll records, 2-ER-247.

In addition, the affiant, a 17-year veteran with ten years' experience investigating narcotics, explained that, in his training and experience, drug dealers launder proceeds through money transfer agencies like Walmart, 2-ER-241, they use stash houses to hide their drugs to "keep law enforcement and/or competitors from finding" them, 2-ER-251, they use multiple phones "to compartmentalize drug

---

[7] The court agreed that the shooting, alone, had "low" but not "zero" value as evidence that defendant was involved in drug trafficking. 1-ER-25. "If you're going to collect people most likely to be involved in drug distribution, who would be most likely to be involved in drug distribution? People randomly shot in Eugene in an apparent gunfight or people who have never been shot? And it's not worth a lot, but it's certainly got some inference that this person is in the crime world, and once you're in the crime world, drugs is one of the options, right?" *Id.*

trafficking and prevent law enforcement from identifying an entire organization from the seizure of a single device," 2-ER-254, they "very often place assets in names other than their own to avoid detection of these assets by government agencies," 2-ER-257, and they "commonly have in their possession . . . firearms, and other weapons, which are used to protect and secure their property," 2-ER-258.

That provided more than enough to meet the probable cause standard. *See United States v. Ruiz*, 758 F.3d 1144, 1148 (9th Cir. 2014) (probable cause is a "fair probability that contraband or evidence of crime [will] be found in a particular place") (cites omitted); *Kaley v. United States*, 571 U.S. 320, 338 (2014) (it is "not a high bar").

There need only be a "reasonable nexus between the activities supporting probable cause and the locations to be searched." *United States v. Fernandez*, 388 F.3d 1199, 1254 (9th Cir. 2004). "A magistrate is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense," *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986) (cites omitted), and may "rely on the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found," *United States v. Fannin*, 817 F.2d 1379, 1382 (9th Cir. 1987).

Defendant relies heavily on *United States v. Hall*, 113 F.3d 157 (9th Cir. 1997). This case is different. In *Hall*, "[t]he government concede[d] that the state trooper recklessly failed to disclose all of [the informant's] convictions during the search

23

warrant hearing." *Id.* at 159. And when the informant was removed from the equation, what was left "would not amount to probable cause." *Id.* Unlike in *Hall*, where the government offered nothing that would put narcotics in the defendant's trailer except "the word of" the informant, *id.*, here, the government offered enough to satisfy two different reviewing judges even after they specifically excised any fruit of AH's contribution.

Because of the quantum of untainted evidence, Judge Mosman did not reach *Franks*'s first prong. *See United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008) (mens rea question does not need to be addressed if other *Franks* requirements are unmet). Judge Immergut did address both *Franks* prongs and found no fault with the affiant. 1-ER-62–64.

"The key inquiry in resolving a *Franks* motion is whether probable cause remains once any misrepresentations are corrected and any omissions are supplemented." *Norris*, 942 F.3d at 910. "If probable cause remains, the defendant has failed to establish a material omission." *Id. See also United States v. Meek*, 366 F.3d 705, 717 (9th Cir. 2004) (to obtain a *Franks* hearing, the false statements must be "material in tipping the balance on the probable cause decision."). Corroboration of an informant's information counterbalances a deficiency. *Reeves*, 210 F.3d at 1045.

The district court properly denied the *Franks* hearing and suppression motions.

24

## II. The court properly denied defendant's motion to suppress the evidence found on his black iPhone. (Defendant's Argument I.B.)

### A. Standards of Review

A district court's legal conclusions on suppression are reviewed de novo. *United States v. Sullivan*, 797 F.3d 623, 632–33 (9th Cir. 2015). But its "determination of abandonment is a factual finding that we review for clear error." *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986).

### B. Defendant retained minimal property interest in his abandoned black iPhone.

Eugene police picked up the black iPhone at the scene of defendant's 2017 shooting and held it as evidence in that investigation. 1-ER-33–34. Just over two years later, federal agents got a federal warrant to search the phone for evidence of defendant's drug-trafficking crimes. 1-ER-34; 2-ER-342–69. They took custody of the device on January 10, 2020, and submitted it for forensic analysis twelve days later, finding the evidence that defendant sought to suppress. *Id.*

In his arguments to this Court, defendant jumbles the Fourth Amendment issues relating to the seizure and search of the black iPhone. Federal agents had a warrant to search the device's contents—they did not rely on a warrant exception to search. The question presented is whether the two-year gap—between Eugene police seizing the phone and federal agents taking custody of and searching it—was "unreasonable," requiring suppression despite the warrant.

25

The district court said no. First, it found that defendant abandoned any property interest in the phone, and second, even if he retained a property interest, the totality of the circumstances did not warrant suppression. 1-ER-37–43. The district court is right.

### 1. Defendant abandoned the black iPhone.

Abandonment "is a question of intent." *United States v. Fisher*, 56 F.4th 673, 686 (9th Cir. 2022) (quoting *Nordling*, 804 F.2d at 1469). The "inquiry should focus on whether, through words, acts or other objective indications, a person has relinquished a reasonable expectation of privacy in the property at the time of the search or seizure." *Fisher*, 56 F.4th at 686 (quoting *Nordling*, 804 F.2d at 1469).

The district court found that defendant abandoned the phone after dropping it at the shooting scene. 1-ER-37–39. It explained that it "was not clear to the officers" who found the phone "to whom [it] belonged." 1-ER-37.

Even though there was surveillance video showing "Defendant holding a phone to his ear, officers were unable to discern the color of the phone, so it was reasonable for them to conclude that the phone in the  video was the white iPhone, the one found in Defendant's possession at the hospital." 1-ER-38.

"Two important factors" in assessing abandonment are "denial of ownership and physical relinquishment of the property." *Nordling*, 804 F.2d at 1469. The court accepted, for argument purposes, that defendant may have dropped the phone after being shot, rather than purposefully discarding it, but found that his subsequent conduct "suggests the abandonment was not involuntary." 1-ER-38; *cf. California v. Hodari D.*, 499 U.S. 621, 629 (1991) (defendant abandoned cocaine that he tossed away while being chased by police).

The court noted the contrast between the effort made to keep hold of defendant's bag of guns and the complete lack of effort to maintain the phone. 1-ER-38. Defendant's girlfriend grabbed the bag after defendant was shot and put it in defendant's car trunk. *Id.* When help arrived, "she transferred the bag to [their friend's car], and only after that did [the friend] and Jones take Defendant to the hospital." *Id.* Unlike the "apparent care taken to secure the bag, no one at the scene, Defendant, [his girlfriend], or [the friend], made any apparent effort to secure the black iPhone." *Id.*

This case resembles *Fisher* in that regard. *Fisher*, 56 F.4th at 686. There, defendant-brothers hid their digital devices in their attic walls. *Id.* After being arrested, they tried unsuccessfully to have another brother retrieve the devices, but they made no other effort after he failed and later sold the house. *Id.* at 687. Nine months after the sale, police searched with the new owners' consent and found the

devices. *Id.* "Defendants' failure to ensure that [their brother] recovered the devices *before* the home was sold, and their subsequent failure to take any additional action, is sufficient to support a finding of abandonment, even if Defendants ceased their efforts only because they feared detection by law enforcement." *Id.* (emphasis in original).

The court here also doubted defendant's claim that he did not try to recover the phone because he did not know the police took it. 1-ER-39. It found that defendant was on notice that the Eugene police searched the shooting scene and recovered evidence found there. *Id.* And yet, "[t]here is no evidence that Defendant did or said anything in the ensuing months or years to assert or maintain an interest in the black iPhone." *Id.* Not, that is, "until the instant suppression motion," which he filed over three years into his federal case and almost two years after the phone was seized and searched under the federal warrant. 1-ER-40.

"In sum, the objective facts available to the Eugene Police at the time of the seizure—an unidentified cell phone on the ground near a parking lot adjacent to evidence of a shooting—suggest that the iPhone was voluntarily abandoned," and defendant did nothing after that physical relinquishment to assert ownership. 1-ER-39. The district court's abandonment finding is logical, plausible, and supported by record evidence. *United States v. Terabelian*, 105 F.4th 1207, 1213 (9th Cir. 2024) (stating clearly erroneous standard); 1-ER-37–39 (providing record cites).

28

### 2. Because he abandoned the black iPhone, defendant had no standing to suppress the evidence found on it.

To have standing to suppress evidence, a defendant "must show that he personally had a 'property interest protected by the Fourth Amendment that was interfered with . . ., or a reasonable expectation of privacy that was invaded by the search.'" *Fisher*, 56 F.4th at 686 (quote omitted). A reasonable expectation of privacy is one that is both subjectively held, and objectively reasonable—"an expectation that society is prepared to recognize." *Id.* (quote omitted). "[P]ersons who voluntarily abandon property lack standing to complain of its search or seizure." *Id.*

Defendant and amicus lean heavily on *Riley v. California*, 573 U.S. 373 (2014), to argue that even if defendant abandoned his phone, he kept a Fourth Amendment privacy right in the digital data it held. Def. Op. Br. at 19–28. This Court has already disagreed. In *Fisher*, the Court held, "[b]ecause Defendants abandoned the devices, they lost any reasonable expectation of privacy in them, and lacked standing to seek suppression of the devices' contents." *Fisher*, 56 F.4th at 688. That post-*Riley* decision is binding here.

Even if not, defendant's argument does not get him far. *Riley* held that the search-incident-to-arrest doctrine allows an arresting officer to seize the arrestee's cellphone without a warrant but not search its data—they need to keep hold of the phone and get a warrant to search it. 573 U.S. at 386, 388 (defendants "concede that

29

officers could have seized and secured their cell phones to prevent destruction of evidence while seeking a warrant."). That is what happened here.

Although the district court's standing ruling ultimately obviated the need for a warrant, the agents had one. Defendant has never challenged that warrant's validity. 1-ER-32–43 (addressing arguments presented by defendant).

Defendant also never alleged that the government used his device as a portal to access data that he stored on remote servers, as he seems to suggest now. *Compare* Def. Op. Br. at 22, *with* 1-ER-32–43. That is factually untrue. The warrant authorized a search of the device itself; it did not authorize seizure of data stored on the cloud. 2-ER-360, 363. Nothing in this record suggests that officers searched beyond the warrant's scope, and defendant never raised that factual question to the court below. *See United States v. Brewster*, No. 23-329, _ F.4th _, 2024 WL 4157759, at *6 (9th Cir. Sept. 12, 2024) (argument not raised to the district court is forfeited).

Even if *Fisher* did not already foreclose defendant's *Riley*-based argument, any victory would be pyrrhic on defendant's facts.

> **3. The delay between Eugene police seizing the phone and federal officers searching it was not unreasonable and does not merit suppression.**

Once defendant abandoned the black iPhone, he lost standing to challenge its seizure. Even so, the district court looked at the merits of his delay claim and denied it from that vantage too. 1-ER-39–43.

Prolonged property seizure implicates a person's possessory interests, which are different from the privacy interests implicated by a search. *Segura v. United States*, 468 U.S. 796, 806 (1984). To assess whether there has been an "unreasonable delay between the seizure of [property] and obtaining a search warrant" courts must balance the government's interest in the seizure against the defendant's possessory interest in the property seized. *Sullivan*, 797 F.3d at 633. Relevant factors include the extent of the intrusion, the government's interest in retaining the property, its diligence in investigating, and the length of the delay. *Id.*; *see also United States v. Laist*, 702 F.3d 608, 614 (11th Cir. 2012).

As a starting point, the district court rejected the premise that the government held defendant's black iPhone for a continuous 768 days—from the time Eugene police recovered it until federal agents searched it under their warrant. 1-ER-41. Instead, it broke the seizure into two parts—the two years that Eugene police held the phone among the shooting investigation evidence and the few weeks after federal agents had probable cause to search for evidence of defendant's drug trafficking. *Id.*

Defendant invokes the specter of the "silver platter doctrine" to demand scrutiny of Eugene police retaining the phone. He is correct that when evidence is used in a federal prosecution, "a federal court must make an independent inquiry" into a challenged seizure using Fourth Amendment standards—regardless of whether the seizure was done by state or federal officers. *Elkins v. United States*, 364 U.S. 206,

31

224 (1960). Under the circumstances, Eugene police's retention of the iPhone, without searching it, was reasonable. *See Sullivan*, 797 F.3d at 633 (balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.").

Defendant's possessory interest in his phone was interrupted when Eugene police bagged and stored it. But making no attempt to claim the phone between December 2, 2017, and January 9, 2020, diminished that interest. 1-ER-41–42; *Sullivan*, 797 F.3d 633–34 (a defendant who "never sought return of the property" cannot make a sufficient showing of unreasonable delay).

Eugene police's interests justified the dispossession. First, defendant was not a criminal target in their case, "rather they were investigating a shooting where Defendant was the victim when they seized the phone." 1-ER-41. And, "crucially, there was no identified owner of the phone" when they bagged it. *Id.* Police contacted both defendant and his girlfriend—two people who had been at the crime scene—on the night of the shooting, seizing other items from each of them, and putting them on notice that an investigation was underway, and neither of them claimed or sought return of the phone. Indeed, defendant declined to cooperate with the police or discuss the shooting at all. Defendant cites no Fourth Amendment case putting an affirmative duty on police to investigate ownership and return unclaimed property.

And, again, Eugene police never searched this phone. They just held it. That is not the conduct that the unreasonable-delay doctrine seeks to remedy. *See, e.g., United States v. Christie*, 717 F.3d 1156, 1162 (10th Cir. 2013) (then-Circuit Judge Gorsuch discussing delayed search principles).

The district court zeroed in on the timespan of real significance—between "when the [federal] Government developed probable cause to believe the black iPhone contained evidence of Defendant's drug trafficking activities" and when it took and searched the phone. 1-ER-42. Under a December 13, 2019, warrant, the government looked into some of defendant's other phones and found "text messages indicating likely drug trafficking activity during December 2017—the same time as when Defendant was shot in Eugene." *Id.* That gave the government probable cause to believe that any phone defendant had access to at that time would contain drug trafficking evidence. From that point, the government "diligently and promptly sought to secure a search warrant for the black iPhone." *Id.*

The district court correctly found no problematic delay. 1-ER-43. Defendant leaves that decision unchallenged on appeal.

### 4. The officers acted in good faith.

Even if the district court got its Fourth Amendment reasoning wrong, its ruling should stand. Suppression is a court's "last resort, not [its] first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). The remedy should only be used "where it

33

result[s] in appreciable deterrence." *Herring v. United States*, 555 U.S. 135, 140–41 (2009). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 144.

The district court reviewed the progression of the federal investigation, including an affidavit by one of the lead agents, and found that the government worked "diligently." 1-ER-42; 3-ER-439. Without misconduct to deter, suppression is not warranted. *United States v. Jobe*, 933 F.3d 1074, 1078 (9th Cir. 2019).

## SENTENCING ISSUES

**III.** **The district court approximated the quantity of fentanyl analogue that defendant trafficked based an appropriate method and proven facts.** (Defendant's Argument IV.B.)

### A. Standards of Review

This court reviews for clear error a district court's factual findings in the sentencing phase. *United States v. Scheele*, 231 F.3d 492, 497 (9th Cir. 2000). The court's findings must be supported by a preponderance of the evidence. *Id.* "Whether the method adopted by the district court to approximate the relevant quantity of drugs is proper under the guidelines is . . . reviewed de novo." *Id.* (quote omitted).

34

## B.    Defendant's Drug Quantity Computation

The jury convicted defendant of conspiring to distribute, and distributing, counterfeit oxycodone pills containing fentanyl analogue.[8]  It found that both oxycodone-related counts involved ten or more grams of "a mixture or substance containing a detectable amount of any analogue of fentanyl."  3-SER-603, 605.

At sentencing, the district court found defendant responsible for trafficking at least 300 grams of fentanyl analogue, putting him at a base offense level 32.  1-ER-104; USSG § 2D1.1(c)(4); PSR ¶ 47.[9]  Police seized 92 pills attributed to defendant.  3-SER-606–07.  Samples of those were laboratory tested.  3-SER-607.  Each sample contained a fentanyl analogue.  The court used the weight of those sampled pills to estimate that 300 grams of fentanyl analogue equated to at least 2,858 counterfeit oxycodone pills.  PSR ¶ 17 (adopting the lowest pill weight from the tested sample for

---

[8] Count One:  conspiracy to possess with intent to distribute and distribution of fentanyl analogue, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vi), 841(b)(1)(C), and 846; and

Count Two:  possession with intent to distribute fentanyl analogue, in violation of 21 U.S.C. § 841(b)(1)(B)(vi) and (b)(1)(C).  4-ER-783–84.

[9] The court added 2 levels each for money laundering, a gun enhancement and obstruction of justice, and computed defendant's criminal history category as VI.  1-ER-105.  That resulted in a guidelines range of 360 months to life imprisonment.  *Id.* The court further noted that if defendant were criminal history category II, the advisory guidelines range would be 262 to 327 months' imprisonment.  *Id.* The court imposed a sentence of 300 months on Counts 1–4, to run concurrent with 240-month sentences on Counts 6–7.  1-ER-124.

35

most conservative estimate); *United States v. Kilby*, 443 F.3d 1135, 1141 (9th Cir. 2006) (for pills, "the entire weight of the tablet" is used in the calculation, "not just the weight of the pure controlled substance").

Co-conspirator testimony at trial, which the court credited, proved that defendant distributed 2,320 pills. 1-ER-76; *see also* PSR ¶ 30 (2,000 pills to co-conspirator Rylie Jones, 200 pills to co-conspirator PR Suebsang; and 120 pills to AH). The court found that defendant trafficked at least 446 additional pills based on:

1) evidence that defendant flushed pills when police came to search the Dekum residence, *see* 2-SER-430 (pill residue and whole pills found around toilet);

2) co-conspirators' testimony that they saw defendant with additional pills, *see, e.g.*, 2-SER-280–81 (Suebsang saw defendant holding a sandwich bag with "hundreds" of pills);

3) text messages from other customers ordering various pill quantities, *see* 2-SER-460, 466–68 ("Need a hundo," "I need 200 wings for the party," "If you can lock in those 'M's), 3-SER-528, 550, 563 (government's expert explaining slang); and

4) evidence of defendant's $120,000 in unexplained wealth, 1-ER-95; 3-ER-516.

36

Defendant does not take issue with the court's pill count, only with its presumption that at least 2,858 of his fake oxycodone pills contained fentanyl analogue. Def. Op. Br. at 43–46. The court, like the jury, had enough evidence to use the seized and tested pills as a representative sample of defendant's supply.

### C. The court properly relied on the tested sample to approximate the weight of fentanyl analogue.

The Ninth Circuit has approved "several different methods for making drug quantity approximations" where a defendant's relevant drug trafficking conduct exceeds the drugs seized. *Kilby*, 443 F.3d at 1141. Any approximation "must meet three criteria." *Id.* (quoting *United States v. Culps*, 300 F.3d 1069, 1076 (9th Cir. 2002)).

First, the "government is required to prove the approximate quantity by a preponderance of the evidence." *Id.* (quote omitted). Second, the information used to support an approximation must have "sufficient indicia of reliability to support its probable accuracy." *Id.* (quote omitted). Third, because drug quantity is central to the guidelines calculation and "approximation is by definition imprecise, the district court must err on the side of caution in approximating the drug quantity." *Id.* (quote omitted).

Defendant argues that because the trial testimony showed that the pills defendant sold "varied in price, color, markings, and most importantly, strength," the district court should not have used the seized and tested pills as a representative

sample—doing so, according to him, was not "erring on the side of caution." Def. Op. Br. at 45 (citing *Scheele*).

A drug quantity approximation may be based on an extrapolation from a tested sample. *See United States v. McCutchen*, 992 F.2d 22, 25 (3d Cir. 1993) (permitting sample testing). "[T]he government must show, and the court must find, that there is an adequate basis in fact for the extrapolation and that the quantity was determined in a manner consistent with accepted standards of reliability." *Id.* at 25–26.

There was no question that defendant's oxycodone pills were fake. He told co-conspirator PR Suebsang that the pills were fake when he gave them to her to sell. *See, e.g.*, 2-SER-276. And there was no real question that they contained some type of fentanyl. He told her that too. *Id.* at 277.

The government's drug expert explained to the jury that there are varieties of fentanyl—analogues—that vary in potency. 3-SER-541. Some are significantly stronger than pure fentanyl, others not. *Id.* For example, carfentanil is used as a big game tranquilizer, for bears and elephants. *Id.* at 540–41.

The sample pills seized—some from a supply that defendant sold to AH and some from the Dekum house—came in two varieties. The pills from AH were stamped "A215" (like a real oxycodone pill) and contained the fentanyl analogue carfentanil. PSR ¶ 29. The ones recovered from the Dekum house were stamped "E8" and contained a mix of fentanyl and the analogue furanyl fentanyl. *Id.* The drug

expert explained that in 2017 and 2018, when defendant's charged conduct occurred, people were still producing counterfeit oxycodone domestically and there was variety in the ingredients. 3-SER-538 ("there's no one going around . . . testing it").[10] But the trial testimony showed notable consistency in defendant's supply of these two types of pills.

AH testified that she bought 20 to 40 round "light blue" pills from defendant about six or eight times. 2-SER-383–84. Some were stamped "M8," some marked "A215." The jury saw a picture of a counterfeit oxycodone pill—the stamped "E" looks like a sideways M.



3-SER-596. She said that once she got "some white pills" that had "no opiate whatsoever," and her customers complained. 2-SER-387–88. "[B]ut for the most part, they were the M8s." *Id.* at 387. And she did not get any other complaints. *Id.* at 388.

Co-conspirator PR Suebsang testified that defendant gave her "little small pills" to sell. 2-SER-277. The first batch was green 15-milligram tablets, the second was

---

[10] The Mexican cartels now corner the market with a more consistent product. 3-SER-535–36.

blue 30-milligram pills. *Id.* at 278–79. "[T]hey had an 'M' on them." *Id.* at 278. She sold them for $1 per milligram. *Id.* at 279. She sold "2- to 500" pills between 2017 and mid-2018. *Id.* at 280.

The government seized small, round, blue "E8" pills from the Dekum residence. The tested sample contained a mix of fentanyl and the analogue furanyl fentanyl. 3-SER-606–07.

Co-conspirator Rylie Jones did not describe the look of the pills that defendant sold her, but she testified that she paid $30 per pill, consistent with PR Suebsang's pricing for a 30-milligram pill. 1-SER-177, 183. Jones bought between 50 and 300 pills from defendant about ten different times, all for her father. *Id.* at 177–78. In text messages between Jones and her dad, he described both his pain and withdrawal symptoms as he waited for new pill supplies, and his relief after getting them. 1-SER-248–49, 253. Most of his texts show him "feeling better" after taking defendant's supply—supporting a conclusion that defendant's pill supply was largely consistent. *See, e.g.*, 1-SER-253–54. In one text, he tells Jones, "The ones with 'A' on top and '215' seem to be best." 1-SER-195. The "ones with 'M' in a square," he said, are "doing nothing and really haven't in the past either." *Id.* The "A215" pills recovered from AH are the ones that contained the animal tranquilizer carfentanil. PSR ¶ 29. Even though Rylie Jones's father felt little effect from the E8's, the drug expert told the jury that users can build up tolerance to fentanyl and its analogues. 3-SER-537.

40

All of this together supported the district court in using the seized and tested pills as a representative sample. As the court stated, "We don't have any evidence that fentanyl was the substance. All of the evidence we have that was being distributed was that it was fentanyl analogue." 1-ER-104. The court noted, "it would certainly be better if more pills were tested, but there were regular customers. The evidence shows that whatever the defendant was dealing, people kept buying, and the evidence that we do have is that the pills that he sold, that were tested, that were at his house, had fentanyl analogue." *Id.*

The court's reasoning is further bolstered by the jury's verdict. The jury found beyond a reasonable doubt that defendant sold fentanyl analogue to his co-conspirators—even though none of the pills that he sold to PR Suebsang or Rylie Jones were recovered or tested. 3-SER-600; 3-SER-609 (affirming jury's verdict). Defendant challenged that finding in a motion for acquittal, which the court denied, and which he does not appeal. 3-SER-598, 609.

*Scheele* requires the sentencing court to err on the side of caution "whenever a court is estimating drug quantities, not just when choosing between two equally plausible estimates." *Scheele*, 231 F.3d at 498. Defendant reads *Scheele* to require a lower guideline range, even if the court is choosing between a plausible estimate and speculation. That is not supported by the case law. The court's computation is correct.

## IV. Defendant's prior convictions for Oregon delivery of a controlled substance are ACCA predicates. (Defendant's Argument IV.C.)

### A. Standard of Review

This Court reviews de novo whether a prior conviction qualifies as a predicate under the ACCA, 18 U.S.C. § 924(e). *United States v. Walker*, 953 F.3d 577, 578 n.1 (9th Cir. 2020).

### B. Defendant has three prior serious drug offenses.

Defendant has three prior convictions that qualify as "serious drug offenses" under the ACCA:

1. Delivery of a Controlled Substance (1999), Multnomah County, case number 99-10-38085;

2. Delivery of a Controlled Substance (2001), Multnomah County, case number 01-06-34539; and

3. Possession with Intent to Distribute More than Five Grams of Cocaine Base (two counts) (2005), District of Oregon, case number 02-cr-00333-BR.

The federal conviction is straightforward. It is "an offense under the Controlled Substances Act . . . for which a maximum term of imprisonment of ten years or more is prescribed by law." 18 U.S.C. § 924(e)(2)(A)(i); 21 U.S.C. § 841(a)(1), (b)(1)(B)(iii) (class B felony punishable by 5 to 40 years' imprisonment). The two state convictions are at issue.

42

### 1. Oregon DCS necessarily entails drug distribution conduct.

The two Multnomah County convictions for delivery of a controlled substance (DCS) qualify as "offenses under State law, involving . . . distributing . . . a controlled substance . . . for which a maximum term of imprisonment of ten years or more is prescribed by law." 18 U.S.C. § 924(e)(2)(A)(ii).

The parties agree on the legal test. To decide whether Oregon DCS is an "offense[. . .] involving distributing" a controlled substance, the Court asks whether Oregon DCS "necessarily entail[s]" distribution conduct. *Shular v. United States*, 140 S. Ct. 779, 784-85 (2020) (quote omitted) (holding that the "necessarily entails" test, not the "generic offense" test, applies to § 924(e)(2)(A)(ii)).

Defendant insists that to engage in distribution conduct, a person must "possess or . . . offer to deliver" a controlled substance. Def. Op. Br. at 50 (quoting *Sandoval v. Sessions*, 866 F.3d 986, 990–91 (9th Cir. 2017). But "[t]he courts usually interpret the term 'distribution' quite broadly," to "criminalize participation in the transaction viewed as a whole." *United States v. Ahumada-Avalos*, 875 F.2d 681, 683 (9th Cir. 1989) (quote omitted) (interpreting "distribution" in 21 U.S.C. § 841). And *Sandoval* does not control a "necessarily entails" analysis.

*Shular* demands that broader reading for the ACCA. *Shular* says that § 924(e)(2)(A)(ii) encompasses "core drug offenses with all manner of terminology, including: trafficking, selling, giving, dispensing, distributing, delivering, promoting,

43

and producing." *Shular*, 140 S. Ct. at 785 (quote omitted).  Oregon's DCS, even at its broadest application, requires a defendant to participate in drug dealing.

### 2.  *State v. Self*

As with all categorical tests, the Court looks to the state's broadest application of its law to decide whether a conviction under the state statute necessarily requires the target conduct.  The low-water mark for Oregon's DCS is *State v. Self*, 75 Or. App. 230 (1985).  *See Cortes-Maldonado v. Barr*, 978 F.3d 643, 648 (9th Cir. 2020) (citing *Self* in holding that Oregon's DCS is categorically broader than the federal generic definition of "illicit trafficking of a controlled substance" under the elements comparison test).

In *Self*, the defendant, who was in jail at the time, asked a man named Webb to bail another friend out of jail.  Self promised that a third person would pay Webb back with drugs.  When police intervened, no drugs had yet changed hands and the defendant, himself, had none in his personal possession.  But by promising to procure drugs in exchange for a thing of value (bail money), defendant brokered a drug deal.  His intended next step—by his own admission—was to facilitate the promised exchange between Webb and the dealer.

*Self* is held up as a case of "mere solicitation."  *Sandoval*, 866 F.3d at 988.  But Self's role in the planned drug transaction was far from nascent.  He called Webb four times about the plan (and called Webb's foster daughter twice).  *Self*, 75 Or. App. at 232.  When Webb asked about collateral for the bail money, Self told him that the

44

man being bailed out "would go to two places in Eugene and get the money to repay Webb. Then, as further reward, Webb and [the bailee] would go to San Francisco, where [the bailee] would obtain and give Webb five kilos of cocaine." *Id.*

Self set up the when, the how, and the how much of this exchange—all "steps leading up to the ultimate transfer." *United States v. Penn*, 63 F.4th 1305, 1312 (11th Cir. 2023). That kind of drug-brokering is distribution conduct. Although small scale, Self's work looks every bit like the arms-length organizing of any drug trafficking organization leader—never touching the drugs or money directly but orchestrating the crimes of middlemen. Police stopped Self's deal before it was finished, but the state's evidence was enough to show that Self had done his part. 75 Or. App. at 239.

### 3. Other circuits agree that brokering is distribution conduct.

Other courts agree that arms-length drug dealing of this kind falls within the scope of the ACCA's distribution conduct. The Fifth Circuit said so when looking at a comparable Texas drug law, which encompasses offers to sell drugs even where the defendant might "not have any drugs to sell or even intend ever to obtain the drugs he is purporting to sell." *United States v. Prentice*, 956 F.3d 295, 300 n.6 (5th Cir. 2020). It explained, "the *Shular* Court focuses on conduct involving 'intent to . . . distribute' as necessarily encompassing conduct *that is a part of a process of* distribution." *Id.* at 300 (emphasis in original). "[I]t follows that one cannot intend to *offer* to sell . . . without intending that offer to be taken by the buyer to be part of a process that concludes

45

with the buyer's actually receiving what is offered." *Id.* (emphasis in original). *See also United States v. Clark*, 49 F.4th 889, 893 (5th Cir. 2022) (distinguishing a fraudulent offer to sell because it does not have the requisite intent).

The Eleventh Circuit agreed in *Penn*, 63 F.4th at 1312–16. The least culpable act for Penn's Florida drug conviction was the "attempted transfer of a controlled substance for value." *Id.* at 1312 (quote omitted). Looking first at the dictionary definition of "distributing," which includes the acts of "promot[ing], sell[ing], and ship[ping] or deliver[ing]," *Penn* agreed that "although the final transfer of an item is part of the core of 'distribute,' other steps leading up to the ultimate transfer are part of distribution, too." *Id.* (quote omitted). Through that lens, it said, "we believe that attempts to transfer drugs are part of *completed* sale offenses," not a separate, inchoate crime. *Id.* at 1317 (emphasis in original).[11]

---

[11] Other pre-*Shular* decisions align, but they came to their holdings through a broader reading of the ACCA's term "involving" than the "necessarily entails" formulation that *Shular* adopted. *See, e.g.*, *United States v. Whindleton*, 797 F.3d 105, 109-11 (1st Cir. 2015); *United States v. Vickers*, 540 F.3d 356, 365 (5th Cir. 2008); *United States v. Bynum*, 669 F.3d 880, 886 (8th Cir. 2012).

That is, in part, what makes *Prentice* so persuasive. The Fifth Circuit revisited the Texas drug law and held that it still counts under *Shular*'s stricter standard. *Prentice*, 956 F.3d at 299–300; *see also United States v. Tucker*, 821 F. App'x. 659, 662 n.3 (8th Cir. 2020) (agreeing that *Shular* did not affect *Bynum*); *see generally United States v. Fields*, 53 F.4th 1027, 1056 (6th Cir. 2022) (Murphy, J., concurring) (observing that "no circuit court" has reversed course based on *Shular*'s narrowed definition of "involving").

46

### 4. *Sandoval v. Sessions*'s hard line on solicitation is not the issue here.

Defendant seeks to carry *Sandoval*'s assessment of Oregon's DCS over into the ACCA context. But *Sandoval* applied the generic offense categorical test—directly comparing Oregon drug law's definition of "deliver" with how that word is defined by the federal Controlled Substances Act ("CSA"). *Sandoval*, 866 F.3d at 989. The CSA defines "deliver" as "the actual, constructive, or attempted transfer" of a drug. *Id.* (quoting 21 U.S.C. § 802(11)). Federal law excludes solicitation from "attempted transfer[s]" under the CSA. *Id.* (cite omitted). Oregon law did not.[12] So the federal and state elements did not match.

That is not the question under the test applicable here. Whether a conviction under Oregon DCS "necessarily entail[s]" distribution *conduct* does not require such a technical parsing of legal definitions. Untethered from the elements-comparison test, this Court has even looked at the CSA's "distribution provision . . . to criminalize participation in the transaction viewed as a whole." *Ahumada-Avalos*, 875 F.2d at 683

---

[12] It does now. *See State v. Kimbrough*, 285 Or. App. 84 (2017) (Oregon's inchoate crimes of Attempt and Solicitation are distinct); *see also State v. Hubbell*, 314 Or. App. 844 (2021) ("attempted transfer" under Or. Rev. St. § 475.005(8) means to try and fail to transfer drugs, it does not incorporate the elements of the inchoate crime of Attempt).

(quote omitted) (making calls arranging price, amount, delivery location, and payment enough to prove that defendant's involvement in distributing narcotics).

In other statutory contexts, this Court has affirmed distribution convictions where a defendant set up (but did not complete) contraband sales. For example, in *McElmurry*, the Court did a *Blockburger* analysis of child pornography possession and distribution convictions. *United States v. McElmurry*, 776 F.3d 1061, 1064 (9th Cir. 2015) (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). It accepted that "[i]t is impossible to 'receive' something without, at least at the very instant of 'receipt,' also 'possessing' it," but not so with distribution. *McElmurry*, 776 F.3d at 1064 (citing *United States v. Davenport*, 519 F.3d 940, 943 (9th Cir. 2008)).

"Suppose Tom, Dick and Harry are involved. Tom asks Dick for a prohibited image. Dick says, 'I don't have it, but Harry does, and I'll ask him to send it to you.' Dick does not possess, but nevertheless distributes, because he brought about Harry's distribution." *McElmurry*, 776 F.3d at 1064. A "distributor, as in the Tom, Dick and Harry hypothetical, need not himself possess" the images. *Id.* In fact, "[o]ne need not even have constructive possession to be a distributor. Dick, in the hypothetical, does not need 'dominion and control' over Harry's image to arrange for Harry's distribution to Tom." *Id.* Likewise, Self did not need to have control over his California supplier's drug stash to arrange the distribution to Webb. And Self, unlike

Dick, set up his distribution deal in order to get something that was of value to him—the bail money for his jailed friend.

Under the necessarily-entails test, it is the conduct that a statute reaches that matters and, whether you call it soliciting or brokering, even the least culpable defendant convicted under Oregon DCS necessarily engages in drug-distribution conduct. *Shular*, 589 U.S. at 165 (section 924(e)(2)(A)(iii) sweeps in offenses involving the listed drug-related conduct, it does not name qualifying offenses).

The district court correctly sentenced defendant as an Armed Career Criminal.

## MISCELLANEOUS ISSUES

**V. The district court exercised sound discretion in denying defendant's recusal motion.** (Defendant's Argument IV.D.)

### A. Standard of Review

This Court reviews recusal orders for abuse of discretion. *United States v. McTiernan*, 695 F.3d 882, 891 (9th Cir. 2012).

### B. Background Facts

In a prior federal case, defendant pleaded guilty to two counts of possession with intent to distribute cocaine base, and one count of carrying a firearm in the commission of a drug offense. 21 U.S.C. § 841(a)(1), (b)(1)(B); 18 U.S.C. § 924(c); *United States v. Hunt*, 02-cr-333 (D. Or. 2003). The investigation and indictment of that conduct occurred during the tenure of former U.S. Attorney—now Senior U.S.

District Court Judge—Hon. Michael W. Mosman. 1-ER-47. Defendant pleaded guilty and was sentenced during the tenure of former U.S. Attorney—now U.S. District Court Judge—Hon. Karin J. Immergut. *Id.* President Barack Obama commuted defendant's 240-month prison sentence in 2016, after eleven years served. *Id.*

Defendant's current federal criminal case was originally assigned to Judge Mosman. It transferred to Judge Immergut in July 2021, after Judge Mosman took senior status. 4-ER-797 (ECF No. 162). Defendant never sought Judge Mosman's recusal and he submitted to Judge Immergut's authority without objection for over a year. 4-ER-797–803 (recusal motion at ECF No. 234). He filed representation, custody, suppression, discovery, and speedy trial motions for her review. 4-ER-797–802 (ECF Nos. 164, 172, 176, 177, 194, 195, 221). Less than two months before trial, he sought Judge Immergut's recusal. 4-ER-803 (ECF No. 224). The court denied the motion. 1-ER-44.

## C. Defendant did not have a right to a different judge.

Title 28 U.S.C. § 455(a) states that any judge "shall disqualify [her]self in any proceeding in which [her] impartiality might reasonably be questioned." The test for recusal under section 455 is an objective one—"whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008)

50

(quoting *Clemens v. U.S. Dist. Ct.*, 428 F.3d 1175, 1178 (9th Cir. 2005) (quotes and cites omitted)).

The reasonable person at the helm is not someone who is "hypersensitive or unduly suspicious," but is instead a "well-informed, thoughtful observer." *Holland*, 519 F.3d at 913 (quote omitted). "If it is a close case, the balance tips in favor of recusal." *Id.* at 912. But the standard "must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice." *Id.* at 913 (quoting *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993)).

Unlike § 455(b), which "merely spelled out in detail the 'interest' and 'relationship' grounds of recusal that had previously been covered by" a more generally-worded provision in the statute, § 455(a) serves as a "'catchall' recusal provision." *Liteky v. United States*, 510 U.S. 540, 548 (1994).[13] Under this law "what matters is not the reality of bias or prejudice but its appearance." *Id.* "[B]ias or prejudice" does not mean "*all* unfavorable disposition towards an individual (or his

---

[13] Defendant also sought recusal under 28 U.S.C. § 455(b) below, 1-ER-45, but he has abandoned his argument under that subsection on appeal. *See* Def. Op. Br. at 56–62 (arguing only § 455(a)); *see also* Def. Op. Br. App'x (including only subsection (a) in statutory appendix).

51

case)," but rather only those dispositions that are "somehow *wrongful* or *inappropriate*." *Id.* (emphasis in original).

Even under § 455(a)'s plenary rule, there are some hard lines. A prosecutor-turned-judge cannot preside over a criminal case that she investigated or charged in her former role. *United States v. Arnpriester*, 37 F.3d 466, 467–68 (9th Cir. 1994). It does not matter whether she had a direct hand in the matter, "vertical imputation" gives "to the United States Attorney the knowledge and acts of his assistants." *Id.* at 467 (citing 18 U.S.C. § 207(a)). "A United States District Judge cannot adjudicate a case that he or she as a United States Attorney began." *Arnpriester*, 37 F.3d at 468.

But that is not what happened here. *Arnpriester* does not "require a judge to recuse himself whenever he has served as United States Attorney in any other matter relating to the defendant presently before the judge." *United States v. Silver*, 245 F.3d 1075, 1079 (9th Cir. 2001). *Silver* rejected that broad rule, along with the defendant's argument that a reasonable person would presume that a judge presiding over a recidivist defendant would see it as "pay back time"—essentially what defendant is saying here. *Id.* at 1078.

Recusal in such cases is fact-dependent. *Silver* involved a U.S. Attorney-turned-judge who was presiding over a repeat offender. The defendant had been investigated on another matter ten years earlier, when the judge was U.S. Attorney. *Id.* at 1080. The defendant was charged after the judge left the U.S. Attorney position. *Id.* The

52

only connection between the two cases was that the prior conviction served as a sentencing enhancement in the pending case, which required the judge to consider only the fact and timing of that conviction. *Id.* "That Judge Keller was United States Attorney during the initial phase of Silver's investigation does not lead a reasonable person to question Judge Keller's impartiality," or require his recusal. *Id.*

Similarly here, Judge Immergut served as U.S. Attorney more than thirteen years before presiding over this matter. 1-ER-46. Defendant's prior guilty plea and sentencing occurred during her tenure, but the investigation and charge were made under Judge (then U.S. Attorney) Mosman. *Id.* Like in *Silver*, the only direct connection between the prior case and this one is that the prior conviction serves as a predicate offense for sentencing enhancements, requiring the court to "consider the fact of Defendant Hunt's conviction and nothing more." 1-ER-52. Defendant argues that Judge Immergut, as the sentencing judge, had to consider his prior criminal record among the 18 U.S.C. § 3553(a) factors, but that is not a point of distinction with *Silver*. Def. Op. Br. at 61. The judge there had the same statutory obligation at sentencing, as do all judges.

Defendant accuses Judge Immergut of misreading a bright-line rule into *Silver* that a "judge need only recuse herself when the case before her is the same case, related to the same case, or shares a common event with a case prosecuted during the judge's tenure as U.S. Attorney." Def. Op. Br. at 59 (quoting 1-ER-49–50). And that

53

"[r]ecusal is not necessary when the cases in question are unrelated even if they involve the prosecution of the same defendant." Def. Op. Br. at 60 (quoting 1-ER-50).

Judge Immergut did summarize this Court's recusal boundaries that way, and fairly so. *See Silver*, 245 F.3d at 1079–80; *Gravenmier v. United States*, 469 F.2d 66, 67 (9th Cir. 1972). Then she went on to do "an independent examination of the unique facts and circumstances of the particular claim at issue." *Holland*, 519 F.3d at 913. She found enough space between defendant's prior and current cases to be assured that "a reasonable person" would not be led to "question [her] impartiality." *Silver*, 245 F.3d at 1080.

Judge Immergut went beyond the objective circumstances of the case and checked her subjective perspective, stating, "I have no personal bias or prejudice against Defendant Hunt. Nor do I have any personal recollection of Defendant Hunt or the facts underlying his prior 2005 conviction. Further, I have no knowledge of any disputed evidentiary facts." 1-ER-52.

Most of defendant's examples of judicial "partiality" are adverse rulings for which he can seek (and is seeking) appellate review. A judge's decisions "can only in the rarest circumstances evidence the degree of favoritism or antagonism required" for recusal. *Liteky*, 510 U.S. at 555. "Almost invariably, they are proper grounds for

54

appeal, not for recusal." *Id.* Defendant's collection of non-similarly-situated

defendants—none of whom were ACCA-charged—does not show unfair treatment.

Judge Immergut followed the correct procedure and the correct legal standard

in evaluating defendant's recusal motion. *See* 28 U.S.C. § 455(a), *and In re Bernard*, 31

F.3d 842, 843 (9th Cir. 1994) (recusal motions are to be decided by the presiding

judge). Viewing the full facts, including that defendant raised the motion so late in

the case and so close to trial, she exercised sound discretion in continuing to preside.

That decision should be affirmed.

## VI.     Defendant's felon in possession of a firearm conviction is constitutional as applied to him.

### A.     Standard of Review

This court reviews de novo Second Amendment challenges to 18 U.S.C.

§ 922(g)(1). *United States v. Chi Mak*, 683 F.3d 1126, 1133 (9th Cir. 2012).

### B.     Defendant's convictions under 18 U.S.C. § 922(g)(1) are constitutional under binding precedent.

Defendant's appeal of his felon in possession convictions relies on *United States*

*v. Duarte*, 101 F.4th 657 (9th Cir. 2024). This Court vacated that decision pending en

banc review. *United States v. Duarte*, 108 F.4th 786 (9th Cir. 2024).

That leaves *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010), in place.

Because *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), is not

"clearly irreconcilable" with *Vongxay*, it remains binding. *Bruen*, 597 U.S. at 72 (Alito,

J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm."); *id.* at 80-81 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating assurances that felons can be dispossessed of firearms); *id.* at 129 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) ("I understand the Court's opinion today to cast no doubt on" the Court's statements about felon-in-possession laws).

### C. Section 922(g)(1) meets the *Bruen* test.

Even if the Court looked past binding precedent, defendant's motion still fails.

First, a person may not obtain an as-applied exemption from § 922(g)(1) based on his individualized crimes. Rather, it is enough that Congress may disarm persons who have been convicted of crimes that satisfy the common definition of a felony—punishable by imprisonment for more than one year. The maximum authorized penalty for the offense itself establishes that the crime is serious enough to support disarmament. The Supreme Court has interpreted other Bill of Rights provisions similarly. *See Lewis v. United States*, 518 U.S. 322, 328 (1996); *Branzburg v. Hayes*, 408 U.S. 665, 687 n.24 (1972) (grand jury clause); *Blanton v. City of North Las Vegas*, 489 U.S. 538, 541-545 (1989) (right to jury trial).

A regime of individualized as-applied challenges distorts the separation of powers by allowing the courts to usurp Congress's role in deciding the rigor and severity of the criminal code and the Executive Branch's role in deciding when to make exceptions and grant clemency. It would treat differently this collateral

56

consequence of conviction from others, like the right to vote, to serve on juries, and to hold public office—which have never been suggested as challengeable on the ground they don't fit his felony or circumstances. And it creates a problem of judicial administration without an easily identifiable standard.

Second, the Second Amendment does not protect defendant's right "to keep and bear arms" because he was on supervised release when he possessed the guns. Still subject to the court's jurisdiction for his underlying felony conviction, he lacks the same armament rights as a free person. *See e.g.*, *United States v. Gay*, 98 F.4th 843, 847 (7th Cir. 2024) (finding § 922(g)(1) constitutional as applied because "[p]arole is a form of custody" that just "allow[ed] him to serve some of his sentences outside prison walls"); *United States v. Dorsey*, 105 F.4th 526, 532 (3rd Cir. 2024) (same, noting parolees are "in a position different from the general population because they are still subject to an extant term of imprisonment").

Third, felons were not among "the people" covered by the Second Amendment when it was adopted. *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008) (Second Amendment protects the rights of law-abiding citizens); Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868) (felons have historically been excluded from the political community); *cf United States v. Perez-Garcia,* 96 F.4th 1166, 1180 (9th Cir. 2024) (noting ambiguity in Supreme Court cases presuming that "the people"

57

refers to "All Americans" while at the same time limiting the textual scope to "law-abiding, responsible citizens").

They have historically been disqualified from other political rights too. *Medina v. Whitake*r, 913 F.3d 152, 160 (D.C. Cir. 2019); *United States v. McCane,* 573 F.3d 1037, 1049 (10th Cir. 2009) (Tymkovich, J., concurring); Akhil Reed Amar, *The Bill of Rights* 48 (1998). Moreover, the Second Amendment codifies a pre-existing right grounded in securing individual safety, *Heller*, 554 U.S. at 592, and "even individuals who are indisputably part of 'the people' . . . might not partake of that pre-existing right and, therefore, may be prohibited from possessing firearms without offending the Second Amendment." *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1045–46 (11th Cir. 2022); *cf United States v. Rahimi*, 144 S. Ct. 1889, 1903 (2024) (finding the term "responsible" too "vague" but saying nothing of the term "law-abiding").

Fourth, this Court has already held post-*Bruen* that the "right to keep and bear arms for self-defense has always coexisted with" a historical tradition of disarmament of persons "whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others," either through dangerous conduct or the inherent danger in disloyalty to the sovereign rule of law (both perceived and real). *Perez-Garcia*, 96 F.4th at 1189, 1186 (finding pre-trial release condition prohibiting gun possession is constitutional). That includes historical felony punishment laws. *Id.* at 1183 (noting that most serious crimes and felonies, even non-violent ones, were

58

capital offenses with death as "the standard penalty"); *id.* at 1186–88 (citing sources such as the 1688–89 English Bill of Rights and the Militia Act of 1662; colonial laws disarming Catholics based on perceived disloyalty and disrespect for the sovereign's laws; colonial laws targeting the disloyal; early American laws that disarmed affrayers, rioters, disturbers, and breakers of the peace whose conduct naturally terrorized the people; precursors to the Second Amendment; and post-ratification commenters). These historical analogues are relevantly similar to § 922(g)(1). *See, e.g.*, *Rahimi*, 144 S. Ct. at 1901 (finding affray or "going armed" laws sufficiently analogous to § 922(g)(8) to pass constitutional muster).

Defendant was convicted of a felony. Several, in fact. That is enough to constitutionally dispossess him. Should this Court consider his individualized as-applied challenge, it too fails given his multiple convictions for drug trafficking and carrying a firearm during and in relation to a drug trafficking crime under 18 U.S.C. § 924(c)—a crime that indisputably involves carrying a gun for non-law-abiding purposes, for which he was on supervised release when he possessed the guns in this case.

59

## CONCLUSION

For the reasons stated herein, the district court's rulings should be affirmed.

Dated:  October 7, 2024.

NATALIE K. WIGHT
United States Attorney
District of Oregon

*s/ Suzanne Miles*
SUZANNE MILES
Criminal Appellate Chief
Assistant United States Attorney

60

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** | 23-2342

The undersigned attorney or self-represented party states the following:

⦿ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

○ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/Suzanne Miles          **Date** | Oct 7, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                    61                    *New 12/01/2018*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 23-2342

I am the attorney or self-represented party.

**This brief contains** 13,465 **words, including** 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Suzanne Miles **Date** Oct 7, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*