No. 23-2342

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

DONTAE LAMONT HUNT,

*Defendant-Appellant*.

————————

On Appeal from the United States District Court
for the District of Oregon, No. 3:18-cr-00475-IM

————————

## REPLY BRIEF OF APPELLANT

————————

JONATHAN S. SACK
RAYMOND D. MOSS
  *Counsel of Record*
MORVILLO ABRAMOWITZ
  GRAND IASON & ANELLO PC
565 Fifth Avenue
New York, NY 10017
(212) 856-9600
rmoss@maglaw.com

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

ARGUMENT ........................................................................................1

I.    None Of The Government's Arguments Justify Admitting The Fruits Of The Warrantless Seizure Of The Black iPhone ................................1

    A.    The Abandonment Doctrine Does Not Apply To A Cellphone's Digital Data ...........................................................................1

    B.    In Any Event, Hunt Did Not Abandon His Black iPhone Or Its Digital Data ...........................................................................3

    C.    The Warrantless Seizure For 25 Months Was Not Constitutional .......7

    D.    The Good Faith Exception Does Not Apply ......................................11

II.    The Government Fails To Demonstrate That Untainted Evidence Supports The Premises Warrants .................................................................12

III.    The District Court Committed Multiple Errors At Sentencing. ...................17

    A.    The District Judge Needed To Recuse Herself To Maintain The Appearance Of Impartiality..............................................................17

    B.    Bare Solicitation Under Oregon Law Is Not A "Serious Drug Offense" Under The ACCA ...............................................................21

    C.    The District Judge Did Not Consider The Margin Of Error In Approximating Unseized Drug Quantities.........................................25

IV.    The Government Fails To Demonstrate That 18 U.S.C § 922(g)(1) Is Constitutional As Applied To Hunt, A Non-Violent Offender .....................27

CONCLUSION ....................................................................................29

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## <u>Cases</u>

*Carpenter v. United States,*
   585 U.S. 296 (2018) ............................................................................... 2

*Cortes-Maldonado v. Barr,*
   978 F.3d 643 (9th Cir. 2020) .................................................... 21, 22, 23

*Davis v. United States,*
   564 U.S. 229 (2011) ............................................................................... 11

*Elkins v. United States,*
   364 U.S. 206 (1960) ............................................................................ 7, 11

*Frimmel Mgmt., LLC v. United States,*
   897 F.3d 1045 (9th Cir. 2018) .............................................................. 13

*Gravenmier v. United States,*
   469 F.2d 66 (9th Cir. 1972) .................................................................. 18

*Liteky v. United States,*
   510 U.S. 540 (1994) ............................................................................... 20

*New York Rifle & Pistol Assn., Inc. v. Bruen,*
   597 U.S. 1 (2022) ............................................................................ 26, 28

*Riley v. California,*
   573 U.S. 373 (2014) ....................................................................... 1, 3, 8, 9

*Sandoval v. Sessions,*
   866 F.3d 986 (9th Cir. 2017) .......................................................... 22, 23

*Shular v. United States,*
   589 U.S. 154 (2020) ............................................................................... 22

*State v. Self,*
   75 Or. App. 230 (1985) ......................................................................... 22

*United States v. Ahumada-Avalos*,
   875 F.2d 681 (9th Cir. 1989) ................................................................ 24

*United States v. Artis*,
   919 F.3d 1123 (9th Cir. 2019) ................................................................ 3

*United States v. Biddle*,
   467 F. App'x 693 (9th Cir. 2012) ........................................................... 6

*United States v. Camou*,
   773 F.3d 932 (9th Cir. 2014) ............................................................3, 11

*United States v. Christie*,
   717 F.3d 1156 (10th Cir. 2013) ........................................................... 10

*United States v. Davis*,
   806 F. App'x 572 (9th Cir. 2020) ......................................................... 23

*United States v. Dorsey*,
   105 F.4th 526 (3rd Cir. 2024) .............................................................. 27

*United States v. Duarte*,
   101 F.4th 657 (9th Cir. 2024) ........................................................ 26, 27

*United States v. Duarte*,
   108 F.4th 786 (9th Cir. 2024) .............................................................. 27

*United States v. Feldman*,
   983 F.2d 144 (9th Cir. 1992) ............................................................... 29

*United States v. Fields*,
   53 F.4th 1027 (6th Cir. 2022) .............................................................. 23

*United States v. Fisher*,
   56 F.4th 673 (9th Cir. 2022) ....................................................... 1, 2, 6-7

*United States v. Gay*,
   98 F.4th 843 (7th Cir. 2024) ............................................................... 27

iii

*United States v. Hall*,
   113 F.3d 157 (9th Cir. 1997) ................................................................. 17

*United States v. Herrera-Valdez*,
   826 F.3d 912 (7th Cir. 2016) ................................................................. 20

*United States v. Holland*,
   519 F.3d 909 (9th Cir. 2008) ........................................................... 17, 18

*United States v. Jaramillo*,
   745 F.2d 1245 (9th Cir. 1984) ............................................................... 20

*United States v. Jobe*,
   933 F.3d 1074 (9th Cir. 2019) ................................................................11

*United States v. Johns*,
   891 F.2d 243 (9th Cir. 1989) ................................................................. 13

*United States v. Laist*,
   702 F.3d 608 (11th Cir. 2012) ............................................................... 10

*United States v. Lopez-Cruz*,
   730 F.3d 803 (9th Cir. 2013) ................................................................... 3

*United States v. McElmurry*,
   776 F.3d 1061 (9th Cir. 2015) ......................................................... 23, 24

*United States v. Nora*,
   765 F.3d 1049 (9th Cir. 2014) ............................................................... 17

*United States v. Penn*,
   63 F.4th 1305 (11th Cir. 2023) ............................................................. 23

*United States v. Perez-Garcia*,
   96 F.4th 1166 (9th Cir. 2024) ............................................................... 28

*United States v. Perkins*,
   850 F.3d 1109 (9th Cir. 2017) ............................................................... 15

iv

*United States v. Prentice,*
    956 F.3d 295 (5th Cir. 2020) ............................................................. 23

*United States v. Rahimi,*
    144 S. Ct. 1889 (2024) ........................................................ 26, 27, 28

*United States v. Scheele,*
    231 F.3d 492 (9th Cir. 2000) ............................................................. 24

*United States v. Silver,*
    245 F.3d 1075 (9th Cir. 2001) ..................................................... 18, 19

*United States v. Sineneng-Smith,*
    590 U.S. 371 (2020) ............................................................................ 2

*United States v. Smith,*
    775 F.3d 879 (7th Cir. 2015) ............................................................. 20

*United States v. Song Ja Cha,*
    597 F.3d 995 (9th Cir. 2010) ........................................................ 9, 11

*United States v. Stephens,*
    206 F.3d 914 (9th Cir. 2000) ............................................................... 6

*United States v. Sullivan,*
    797 F.3d 623 (9th Cir. 2015) ............................................................. 10

*United States v. Underwood,*
    725 F.3d 1076 (9th Cir. 2013) ........................................................... 16

*United States v. Vongxay,*
    594 F.3d 1111 (9th Cir. 2010) ........................................................... 27

*Williams v. Pennsylvania,*
    579 U.S. 1 (2016) .............................................................................. 20

## **Statutes**

18 U.S.C § 922(g)(1) ............................................................... 26, 27, 28

v

18 U.S.C. § 2252(a)(2) ................................................................. 23

18 U.S.C. § 3553(a) ..................................................................... 19

28 U.S.C § 455(a) .................................................................. 18, 20

## **Rules**

Fed. R. App. P. 10(e) .................................................................... 6

Fed. R. Crim. P. 16(a)(1)(E)(i) .................................................. 14

## **Other Authorities**

Eugene City Code 2.835(1) ........................................................... 9

Eugene Police Department Policy Manual § 322.9.2,
   https://tinyurl.com/4wa6m9n5 ............................................... 9

Opening Brief, *United States v. Fisher*,
   2022 WL 619287 (9th Cir. Feb. 28, 2022) .......................... 2, 3

# ARGUMENT

## I. None Of The Government's Arguments Justify Admitting The Fruits Of The Warrantless Seizure Of The Black iPhone

### A. The Abandonment Doctrine Does Not Apply To A Cellphone's Digital Data

The rationale underlying the abandonment exception to the Fourth Amendment's warrant requirement does not logically extend to a cellphone's digital data. Cellphones, as a category, implicate privacy concerns far beyond those implicated by ordinary physical objects, like a backpack or a purse. The sum of a person's private life can be reconstructed from the broad array of personal information accessible on a cellphone. And the proliferation of cloud computing— allowing individuals to remotely store and access their data from a secondary or replacement device—has only increased these expectations of privacy, even when an owner becomes physically separated from their cellphone. Opening Br. 19-26 (discussing *Riley v. California*, 573 U.S. 373 (2014)); *see also* Brief for American Civil Liberties Union et al. as Amici Curiae 6-21.

The government does not dispute that it makes no sense to extend the abandonment doctrine's reasoning to a cellphone's digital data. Instead, it claims that this Court has already done so. *See* Gov't Br. 29 (citing *United States v. Fisher*, 56 F.4th 673 (9th Cir. 2022)). That contention is baffling. *Fisher* did not discuss (or even cite) *Riley* and did not address privacy expectations in a

cellphone's digital data. The Supreme Court has made clear that courts should not "uncritically extend existing precedents" when "confronting new concerns wrought by digital technology." *Carpenter v. United States*, 585 U.S. 296, 318 (2018). This Court did not do so in *Fisher*.

In *Fisher*, the defendants, two brothers, left a pair of portable hard drives and a cellphone in one brother's attic for ten months after his sale of the house. 56 F.4th at 681. On appeal, the defendants argued only that they "did not intend to abandon the devices." Opening Brief, *United States v. Fisher*, 2022 WL 619287, at *27 (9th Cir. Feb. 28, 2022). Focusing only on their treatment of the physical devices, a panel of this Court concluded that the defendants "abandoned the devices." 56 F.4th at 688. The panel then stated, in a single unreasoned sentence, that the defendants accordingly "lost any reasonable expectation of privacy in [the devices], and lacked standing to seek suppression of the devices' contents." *Id.*

The Court should reject the government's proposed extension of *Fisher* beyond the issue presented in the case. Our adversarial system of adjudication follows "the principle of party presentation," whereby courts "rely on the parties to frame the issues for decision" and "normally decide only questions presented by the parties." *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) (cleaned up). That principle counsels against reading a broad holding into *Fisher*, given that the panel was neither presented with, nor analyzed, the issue in this

2

appeal. *See* Opening Brief, *United States v. Fisher*, 2022 WL 619287, at *27 (arguing "the central issue" was their "intentions . . . regarding the electronic devices").

This Court has demonstrated repeatedly that pre-digital era doctrines should not be mechanically applied to modern cellphones. Before *Fisher*, the Court indicated that a cellphone and its digital data are constitutionally distinct, when it stated that *Riley* "definitely required" officers to obtain a warrant to search an abandoned cellular device. *See United States v. Artis*, 919 F.3d 1123, 1127-28 (9th Cir. 2019). And when this Court has been asked to address *Riley*'s impact on other Fourth Amendment doctrines, it has declined to uncritically extend the doctrine to cellphones. *E.g.*, *United States v. Camou*, 773 F.3d 932, 942 (9th Cir. 2014) ("[C]ell phones are not containers for purposes of the vehicle exception.").

Because the abandonment exception does not apply to a cellphone's digital data when an owner merely becomes separated from the physical device, Hunt has standing to challenge the warrantless seizure and delayed search of his black iPhone.

### B.  In Any Event, Hunt Did Not Abandon His Black iPhone Or Its Digital Data

The parties agree that abandonment is "a question of intent" based on all "objective facts available to the Eugene Police *at the time of the seizure*." Gov't Br. 26, 28 (emphasis added) (cleaned up); *see also United States v. Lopez-Cruz*,

3

730 F.3d 803, 808 (9th Cir. 2013). At that time, Hunt was in the emergency room as doctors worked to determine whether surgery was needed for a bullet lodged near an artery; he could not recall what happened to him earlier in the night; and he objected and refused to provide the police the password to his white iPhone. 3-ER-452-53. Given those circumstances, there is no evidence that Hunt intended to abandon his black iPhone or its digital data at the time of the seizure. Opening Br. 26-28.

The government tries to downplay the Eugene police's knowledge at the time of the seizure, arguing that it "was not clear to the officers who found the phone to whom it belonged." Gov't Br. 26 (cleaned up). The government insists that the "officers were unable to discern the color of the phone" from the surveillance video and so "it was reasonable for them to conclude that the phone in the video was the white iPhone" taken from Hunt at the hospital. *Id.* (cleaned up).

That argument fails to account for *all* objective facts available to the Eugene police. The surveillance video, reviewed by officers at the crime scene, showed the gunman step out from behind a garage unit, fire at Hunt, and retreat behind the unit, fleeing in the opposite direction. 3-ER-451. Officers found the black iPhone on the ground where Hunt fell. There was no testimony at the suppression hearing from any Eugene officer at the scene, let alone testimony stating it "was not clear to the officers" to whom the phone belonged. To the contrary, as the government

4

admitted in its subsequent search warrant application, the Eugene police found the black iPhone "on the ground where [Hunt] was shot, consistent with him dropping it." 2-ER-351.

At the same time, the government tries to magnify the actions of *a third party*, suggesting that Riley Jones's "effort" to pick up Hunt's satchel evinces Hunt's intention to abandon his cellphone. Gov't Br. 27. The government's reasoning rests on a series of assumptions, including that Hunt remained conscious after the shooting, that he directed Jones to pick up the satchel, that he realized he had dropped the black iPhone, and that he chose not to ask Jones to search for it. No evidence supports those assumptions. If anything, contemporaneous evidence supports the opposite conclusion—that Jones acted on her own in the moments after the shooting and in getting Hunt to the hospital. *E.g.*, 3-ER-452 (police report) ("[Hunt] continued to appear to be in substantial pain and told me that he did not remember what happened to him.").

The government then tries to minimize the Eugene police's failure to return the black iPhone to Hunt, claiming officers put him "on notice" that they had recovered it. Gov't Br. 28. Not so. The police returned a set of keys found at the crime scene to Hunt's girlfriend and issued a property receipt to Hunt for the seized white iPhone yet chose not to inform Hunt that they seized his black iPhone. 3-

ER-449; 3-ER-453.  Those actions suggested to Hunt that the police *did not* seize the black iPhone.

The government likewise errs as a matter of law in contending that there is "no evidence" that Hunt "did or said anything in the ensuing months or years to assert or maintain an interest in the black iPhone." Gov't Br. 28 (cleaned up).  That assertion says nothing about what the police knew at the time of the seizure, and it ignores the undisputed fact that Hunt password protected the black iPhone.  *See* 3-ER-440-41; Exhibit B to Fed. R. App. P. 10(e) Unopposed Motion, 9th Cir. Dkt. 25.  That fact alone demonstrates Hunt's continued expectation of privacy in the black iPhone's digital data.  *See* Opening Br. 26-27.  But in any event, the Eugene police's repeated violations of the Fourth Amendment—the warrantless seizure of the white iPhone from Hunt in the emergency room because they were "investigating" the shooting, 3-ER-453, the warrantless seizure of his girlfriend's red iPhone after "traffic violations," Dkt. 63 at 4, and the warrantless seizure of the black iPhone mere feet from where Hunt fell—tainted "any succeeding actions by [Hunt], whether or not those succeeding actions constituted abandonment." *United States v. Biddle*, 467 F. App'x 693, 695 (9th Cir. 2012); *see also United States v. Stephens*, 206 F.3d 914, 917 (9th Cir. 2000) ("An abandonment must be voluntary,

and an abandonment that results from Fourth Amendment violation cannot be voluntary." (citation omitted)).[1]

In short, when the Eugene police seized the password-protected black iPhone lying on the ground where Hunt was shot, the objective facts available to the Eugene Police did not establish by a preponderance of evidence that it or its digital data were abandoned. No evidence available then—or now—demonstrates Hunt's voluntary intention to abandon the phone or its digital contents. Hunt thus maintained a reasonable expectation of privacy in his black iPhone and has standing to challenge the warrantless seizure and delayed search.

## C. The Warrantless Seizure For 25 Months Was Not Constitutional

The government concedes that the Fourth Amendment "demand[s] scrutiny" of the Eugene police's two-year retention of the black iPhone. Gov't Br. 31 (citing *Elkins v. United States*, 364 U.S. 206, 224 (1960)). But it fails to scrutinize the Eugene police's interest in indefinitely retaining Hunt's cellphone, arguing instead that the Eugene police "just held it" and that the "timespan of real significance" involved the *federal* government. Gov't Br. 33. The district court erred similarly,

---

[1] The government puts great weight on *Fisher*, Gov't Br. 27-28, where the defendants (i) knew they hid their devices in the attic, (ii) enlisted a third brother to retrieve the devices, and (iii) sold the house to a new owner even after the brother was unable to find the devices. 56 F.4th at 686-87 & n.18. No evidence shows Hunt (i) knew where his black iPhone was located, (ii) enlisted Jones (or anyone else) to search for it at that location, or (iii) took subsequent voluntary action indicating his intention to abandon the phone or its digital data.

concluding only that the federal government has a "legitimate" interest in the black iPhone because of its "real and substantial interest in investigating drug trafficking." 1-ER-41. That may be true as a general matter, but it is irrelevant here. The Eugene police were not investigating drug trafficking and, as the government admits, Hunt was the victim, "not a criminal target," in its shooting investigation. Gov't Br. 32. With no government interest to tip the scales, that should be the beginning and end of this Court's balancing inquiry.

Rather than explain the Eugene police's interest in dispossessing a shooting victim of his cellphone, the government attempts to minimize Hunt's possessory interest in the black iPhone by claiming that his interest was only "interrupted." Gov't Br. 32. In the government's view, Hunt then "diminished that interest" by "making no attempt to claim *the phone*." *Id.* (emphasis added); *see also* Gov't Br. 25 (stating that Hunt "retained minimal property interest" in his phone (boldface omitted)). That reasoning ignores the constitutional distinction between a physical cellphone and its digital data and defies the Supreme Court's proclamation that a person's interest in the "broad array of private information" on their cellphone "dwarf[s]" their interest in ordinary physical objects. *Riley*, 573 U.S. at 397-98. The government's theory also ignores the fact that Hunt password protected the black iPhone and that police misconduct necessarily tainted any subsequent actions by Hunt as to the device itself. *Supra* p. 6.

8

The government suggests in passing that the Eugene police indefinitely seized the black iPhone as "evidence" in the shooting investigation. Gov't Br. 25. But unlike, say, "a piece of chewed gum" found along the path where the shooter fled or "metal bullet fragments" found throughout the crime scene, 3-ER-450-51, a modern cellphone—"a pervasive and insistent part of daily life," *Riley*, 573 U.S. at 385—is not inherently "evidence" of a shooting, particularly when the police knew that the phone did not belong to the shooter and otherwise did not attempt to search the phone. This Court has squarely rejected the notion that there is "a 'crime scene exception' to the warrantless seizure rule that would allow for warrantless seizures of unlimited duration." *United States v. Song Ja Cha*, 597 F.3d 995, 1002 n.6 (9th Cir. 2010).

Without facts on its side, the government attacks a strawman, suggesting there is no authority "putting an affirmative duty on police to investigate ownership and return unclaimed property." Gov't Br. 32. That argument turns Fourth Amendment jurisprudence on its head. Absent an exception to the Fourth Amendment's warrant requirement, officers may only seize a cellphone based on probable cause and only for a reasonable time while they obtain a search warrant. *See* Opening Br. 28-29. No exception to the warrant requirement existed, no probable cause supported the seizure of the cellphone, and, as the government concedes, the Eugene police "never searched" it. Gov't Br. 33. The police

9

therefore were not permitted to keep the cellphone. Under these circumstances, the Eugene police needed to notify Hunt that they possessed his property and return the black iPhone to him. *See* Eugene City Code 2.835(1); *see also* Eugene Police Department Policy Manual § 322.9.2, https://tinyurl.com/4wa6m9n5.

Cases on which the government relies confirm the district court's error in finding no unreasonable delay. *See* Gov't Br. 25, 30-33. In *United States v. Sullivan*, 797 F.3d 623, 633-34 (9th Cir. 2015), a 21-day delay in searching a laptop was reasonable because the owner could not "use . . . the laptop while incarcerated" and gave "express consent" to search it, while the laptop likely "contained evidence of [the owner]'s parole violations." Likewise in *United States v. Christie*, 717 F.3d 1156, 1163 & n.1 (10th Cir. 2013), a five-month delay in searching a laptop was reasonable because the husband "consented to its seizure" and the wife, who the government notified, "raised no objection to the seizure either at the time or in the following weeks." And in *United States v. Laist*, 702 F.3d 608, 616 (11th Cir. 2012), a 25-day delay was reasonable because the government afforded the defendant an "opportunity to copy or remove personal documents" from the computer.

This case is a far cry from those. The Eugene police lacked probable cause to seize the black iPhone, did not notify Hunt of the seizure, and failed to get a warrant to search the black iPhone, while the district court found that Hunt likely

"would not have consented to the search and seizure of the black iPhone." 1-ER-40. Because Hunt's continued interest in the black iPhone and its digital data outweighs the Eugene police's (unidentified) interest in indefinite retention, the warrantless seizure for 25 months was not constitutional, and the district court should have suppressed the fruit of the act.

### D. The Good Faith Exception Does Not Apply

Finally, the government argues that this Court should not suppress the fruits of the warrantless seizure because the *federal officers* acted in good faith by working "diligently." Gov't Br. 33-34 (cleaned up). That assertion (again) ignores that the Fourth Amendment inquiry here focuses on the conduct of the Eugene police. *See Elkins*, 364 U.S. at 224. The good-faith exception applies "when an officer reasonably relies on incorrect information that was the result of *another* individual's 'isolated' and 'attenuated' negligence." *United States v. Camou*, 773 F.3d 932, 945 n.3 (9th Cir. 2014); *see also Davis v. United States*, 564 U.S. 229, 239 (2011) (noting the good-faith cases "have sounded a similar theme"). Here, the Eugene police did not rely on a third party's isolated negligence; to the contrary, its own conduct "was deliberate, culpable, and systemic." *Cha*, 597 F.3d at 1004.

The government's reliance on *United States v. Jobe*, 933 F.3d 1074, 1077 (9th Cir. 2019), is misplaced. Gov't Br. 34. There, a *state officer* "reasonably

11

relied on [a] warrant's authorization to seize digital devices" and applied for a warrant to search the devices within 20 days of the seizure. *Id.* at 1078. Here, by contrast, state officers indefinitely retained the black iPhone without a warrant. That prolonged seizure allowed the federal government to develop probable cause over the ensuing two years to search the black iPhone. *See* Gov't Br. 33.

The Court should vacate the drug trafficking and conspiracy convictions, which the government secured through the fruits of the warrantless seizure.

## II. The Government Fails To Demonstrate That Untainted Evidence Supports The Premises Warrants

Government agents repeatedly misled magistrate judges by omitting Alexandra Hill's significant criminal history—including a conviction for lying to police to avoid arrest—which enabled the government to obtain geolocation and tracking data for cellphones and automobiles linked to Hunt. On appeal, the government does not dispute that the affidavit to the July 19, 2018 geolocation warrant (what the government claims is the first warrant in its investigation) contained intentionally or recklessly misleading omissions and that the affidavit cannot otherwise support probable cause with Hill's statements excised. *See* Gov't Br. 19-24. Instead, the government suggests that a *Franks* hearing is unnecessary because there is sufficient untainted evidence—evidence not derived from the geolocation and tracking warrants—that establishes probable cause for the September 25, 2018 premises warrants. Gov't Br. 21-23. The government fails,

however, to identify evidence derived from an independent source sufficient to support the premises warrants. Opening Br. 32-37.

Trying to defend Officer Sean Macomber's failure to disclose Hill's criminal history in the July 5, 2018 geolocation warrant application—the first warrant in the government's joint investigation with the Portland Police Bureau—the government contends that the warrant played "no role in the federal investigation." Gov't Br. 19 (boldface omitted). The government does not dispute that the geolocation warrant was executed by the joint task force, but it insists that no subsequent warrant application "referenced any data or information derived from that [July 5] warrant." Gov't Br. 19-20.

The government cites nothing to support its bare representation. And it fails to address record evidence supporting the opposite conclusion, including:

- the July 5 warrant was needed to "identify and locate" the unknown user of the -5114 cellphone and was "critical" to the joint investigation, 2-ER-151 (warrant application);

- only "[s]ometime later" did Hill identify Hunt as her source of supply, 2-ER-239, after being shown a booking photo of Hunt, 2-ER-161; and

- the government relied on its identification of Hunt as the user of the -5114 cellphone in subsequent warrant applications, *e.g.*, 2-ER-239-40 (premises warrants).

The government does not even try to explain how it identified Hunt and a new -1751 cellphone in the July 19 geolocation warrant application when, two weeks earlier, it still needed to identify and locate the unknown user of the -5114

13

cellphone. On this record, the apparent answer is that the July 5 geolocation warrant permitted an "illegally obtained identification" that "significantly directed the investigation" towards Hunt, ultimately leading to the evidence seized through the premises warrants. *United States v. Johns*, 891 F.2d 243, 245 (9th Cir. 1989); *accord Frimmel Mgmt., LLC v. United States*, 897 F.3d 1045, 1054-55 (9th Cir. 2018).

Although the government claims that the July 5 warrant was not "material" to its investigation, Gov't Br. 20, it does not explain why it produced the document in discovery. *See* Fed. R. Crim. P. 16(a)(1)(E)(i) (requiring production of documents "*material* to preparing the defense" (emphasis added)). Nor does it explain why that production was three weeks after Hunt filed his suppression motion, Gov't Br. 20, which was 14 months after the government produced the other search warrant applications, Opening Br. 36. The government likewise fails to explain why it prepared a chart "summarizing the warrants" for the district court—which included a warrant that it did not timely execute—but then failed to include the July 5 warrant that was executed. *See* Dkt. 63 at 20; *see also* Gov't Br. 5-6. Such apparent gamesmanship includes the government's admitted *Brady* violation when it produced the Hill interview transcript ten days *after* the district court decided Hunt's first *Franks* and suppression motions—an act that deprived

14

Hunt's trial counsel of the context needed to understand the significance of the July 5 warrant application. *See* Opening Br. 11-13.

But even if the government somehow located Hunt without the July 5 geolocation warrant, the government still fails to identify sufficient untainted evidence supporting the premises warrant applications. The government maintains that three categories of independent evidence establish probable cause for the premises warrants: Walmart money transfers "with no legitimate income explanation," Hunt's criminal history, and a second informant's corroboration of Hill's statements. *See* Gov't Br. 21-22. "Probable cause to search a location exists if, based on the totality of the circumstances, there is a 'fair probability' that evidence of a crime may be found there." *United States v. Perkins*, 850 F.3d 1109, 1119 (9th Cir. 2017). Untainted evidence did not—and does not—support a fair probability that the premises would contain evidence of drugs and firearms. *See* Opening Br. 36-37.

*First*, the government proffers no evidence that it learned of the Walmart money transfers from an independent source. *See* Gov't Br. 22 (citing 2-ER-239-41). The premises warrants only state, without context, that the government "reviewed information provided by Wal-Mart." 2-ER-239. And the government determined that the money transfers had "no legitimate income explanation" based on its tainted electronic and physical surveillance of Hunt. *See* 2-ER-241

15

("Extensive electronic, video, and physical surveillance has shown that [Hunt] does not have a legitimate job."). Even if Walmart sent the government this information unprompted, 16 transfers of small amounts of money over 11 months is not inherently evidence of crimes, let alone drug crimes.

*Second*, although Hunt had three past drug convictions, those offenses were 14-, 17-, and 19-years-old at the time of the premises warrant applications. 2-ER-236. The age of Hunt's convictions "diminishes any marginal relevance they may have had." *Perkins*, 850 F.3d at 1120. No contemporaneous evidence supports the notion that Hunt was engaged in gun- or drug-related offenses at the time of the application in September 2018.[2]

*Third*, Officer Scott McCollister failed to identify his "second informant" in any of the previous six warrant applications, including a geolocation warrant application submitted on September 21—four days before the premises warrant application. *See* Opening Br. 9-10. Given McCollister's repeated prior untruthful representations to the court, the issuing magistrate judge "would have to trust" that there was in fact a second informant. *United States v. Underwood*, 725 F.3d 1076, 1084 (9th Cir. 2013). The government cites no case where a court has accepted such a bare representation from an affiant with a history of misleading the very

---

[2] The district court correctly concluded that the December 2017 shooting of Hunt in Eugene was "not worth a lot," except for "some inference that this person is in the crime world." 1-ER-25; *see* Gov't Br. 22 n.7.

same court. On this record, McCollister should not be entitled to the presumption of truth prior to a *Franks* hearing.

*Finally*, even if there was a fair probability that drugs would be found at the premises, there was no such probability of guns being found. *See* 2-ER-231 (application to seize "[f]irearms and other dangerous weapons and ammunition"). The government conceded below that the Eugene shooting and Hunt's criminal history did not establish probable cause that there would be guns at the premises. *See* Opening Br. 37. At a minimum, that portion of the warrant is invalid, and any evidence of firearm offenses should be suppressed. *See United States v. Nora*, 765 F.3d 1049, 1058 (9th Cir. 2014).

Because probable cause does not support the premises warrants, suppression of the evidence obtained from those warrants is the appropriate remedy. *See United States v. Hall*, 113 F.3d 157, 157 (9th Cir. 1997). The Court should vacate the drug trafficking, conspiracy, money laundering, and firearms-related convictions.

## III. The District Court Committed Multiple Errors At Sentencing

### A. The District Judge Needed To Recuse Herself To Maintain The Appearance Of Impartiality

There is no dispute that Judge Immergut needed to recuse herself if "a reasonable person with knowledge of *all the facts* would conclude that the judge's impartiality might reasonably be questioned." Gov't Br. 50 (quoting *United States*

17

*v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008) (emphasis added)). Here, on behalf of then-U.S. Attorney Immergut, AUSA Gary Sussman filed two superseding indictments against Hunt, prosecuted him, secured his guilty plea, and obtained a 20-year sentence, which the President of the United States commuted after 13 years served. At sentencing in this case, Mr. Sussman argued to his former boss that the 20-year sentence "apparently did little to deter [Hunt] from committing crimes" and "[t]his time, the Court should impose a sentence that will." Dkt. 360 at 1-2. Judge Immergut then imposed Hunt's sentence based in part on the earlier sentence her office's secured, but which Hunt did not fully serve. With knowledge of all the facts, a reasonable person would question whether Judge Immergut was consciously or unconsciously finishing the work of the prosecutor she had been by imposing Hunt's sentence. Opening Br. 40-42, 56-62.

The government fails to address *any* of these facts, let alone *all* of them. Instead, parroting the district court, the government contends that this Court's "recusal boundaries" include a bright-line rule that "a judge need only recuse herself when the case before her is the same case, related to the same case, or shares a common event with a case prosecuted during the judge's tenure as U.S. Attorney." Gov't Br. 53-54 (cleaned up) (citing *United States v. Silver*, 245 F.3d 1075, 1079-80 (9th Cir. 2001), and *Gravenmier v. United States*, 469 F.2d 66, 67

(9th Cir. 1972)).  That is not the law.[3]  To the contrary, 28 U.S.C § 455(a) requires "an independent examination of the unique facts and circumstances of" each case and not a "comparison to similar situations addressed by prior jurisprudence." *Holland*, 519 F.3d at 913; *see also id.* ("Disqualification under § 455(a) … may turn on subtleties in the particular case.").

Undeterred, the government relies heavily on comparison to *United States v. Silver*, 245 F.3d 1075 (9th Cir. 2001), *see* Gov't Br. 52-53, even though that case is the mirror opposite of this one.  In *Silver*, the judge was only U.S. Attorney during the first two years of a five-year investigation.  245 F.3d at 1080.  This Court made clear that the judge "ceased being United States Attorney" five years before the indictment, "did not participate in the conviction," and "was not asked [by the government] to make any determinations or to render an opinion on the [earlier] conviction" at sentencing.  *Id.*  Here, then-U.S. Attorney Immergut's assistant filed multiple superseding indictments, secured Hunt's conviction and a 20-year sentence, and, at sentencing in this case, asked Judge Immergut to treat that 20-year sentence as a benchmark against which to determine Hunt's current sentence—even though the President deemed the length of that punishment disproportionate to the crime.  A reasonable person would question Judge Immergut's impartiality given that she punished Hunt based on an earlier sentence

---

[3] The government continues to cite *Gravenmier* even though it interpreted an outdated version of 28 U.S.C. § 455.  *See* Opening Br. 60 & n.7.

that she secured as the prosecutor—particularly since Hunt served only part of that sentence.

Without law or facts on its side, the government insists that the "only direct connection" between the two cases is "the prior conviction serves as a predicate offense for sentencing enhancements," apparently referencing enhancements under the Armed Career Criminal Act. Gov't Br. 53. That narrow focus on a "direct" connection misconstrues the scope of the inquiry under Section 455(a). But, in any event, it ignores Mr. Sussman's extensive work for then-U.S. Attorney Immergut during the first prosecution, as well as his later argument to Judge Immergut that— "this time"—she should impose a sentence that will deter Hunt. The law required Judge Immergut to consider and weigh that prior conviction in fashioning Hunt's punishment. *See* 18 U.S.C. § 3553(a). And when Judge Immergut stated her intent to impose "a significant sentence" on Hunt, 1-ER-123, his prior convictions were so "sufficiently related that she referred to the prior violations as influencing the sentence she imposed." *United States v. Smith*, 775 F.3d 879, 881 (7th Cir. 2015).[4]

Judge Immergut may have "no personal bias or prejudice" or "personal recollection" of Hunt, Gov't Br. 54 (cleaned up), but actual bias or prejudice is not

---

[4] Although the government argues that "Judge Immergut served as U.S. Attorney more than thirteen years before presiding over this matter," Gov't Br. 53, the Supreme Court has rejected the notion that "the passage of time . . . relieve[s] the former prosecutor of the duty to withdraw in order to ensure the neutrality of the judicial process." *Williams v. Pennsylvania*, 579 U.S. 1, 11 (2016).

essential to the recusal inquiry. What matters under § 455(a) "is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994). Indeed, "observers outside of the judicial process are less inclined to credit judges' impartiality and mental discipline than the judiciary itself will be." *United States v. Herrera-Valdez*, 826 F.3d 912, 918-19 (7th Cir. 2016) (cleaned up). Such observers would not reject "the possibility that . . . an unconscious recollection influenced the sentence she imposed." *United States v. Smith*, 775 F.3d 879, 882 (7th Cir. 2015).

Finally, the government's suggestion that the timing of Hunt's recusal motion "so close to trial" should factor into the Court's analysis is misguided. Gov't Br. 55. The government cites no authority for this proposition. *See United States v. Jaramillo*, 745 F.2d 1245, 1248 (9th Cir. 1984) (upholding a judge's recusal *during* a criminal trial). Hunt's trial counsel filed a motion for recusal soon after becoming aware of the grounds supporting recusal, despite their work on other pre-trial motions at the time. 3-ER-649-51. The government does not challenge—and has not challenged—counsel's diligence in filing the recusal motion.

## B. Bare Solicitation Under Oregon Law Is Not A "Serious Drug Offense" Under The ACCA

The government's ACCA argument repeatedly assumes the answer to the very question at issue: whether Hunt's prior state-law offenses "necessarily entail

distribution." Gov't Br. 43. According to the government, the least culpable conduct under Oregon's drug delivery statute "requires a defendant to participate in *drug dealing*." Gov't Br. 44 (emphasis added). Such conduct, in the government's view, looks "like the arms-length organizing of any drug trafficking organization leader—never touching the drugs or money directly but *orchestrating crimes* of middlemen." Gov't Br. 45 (emphasis added); *see also id.* (referring to the least culpable conduct as "arms-length *drug dealing*" or "drug-brokering" (emphasis added)). The government's theory appears to be that Oregon's drug delivery statute requires the completed act of distribution—even if the defendant, as an accomplice, did not participate directly in the completed act.

Oregon's drug delivery statute criminalizes a broader range of conduct than the government acknowledges. This Court has held repeatedly that "Oregon's definition of delivery encompasses solicitation." *Cortes-Maldonado v. Barr*, 978 F.3d 643, 648 (9th Cir. 2020) (citing *Sandoval v. Sessions*, 866 F.3d 986, 990-92 (9th Cir. 2017)). At the time of Hunt's offenses, violation of the drug delivery statute "*did not require* actual possession or *distribution*." *Id.* at 652 (emphasis added). Instead, a person need "only make some statement that *might* have led another person to aid in the endeavor." *Id.* (emphasis added). Solicitation occurs even when a person "asks an intermediary to ask a third party to commit a crime,

22

*even if the intermediary never communicated with or ultimately procured the third party*." *Id.* at 652 n.17 (emphasis added).[5]

The government attempts to distinguish *Cortes-Maldonado* and *Sandoval*, arguing that the cases "applied the generic offense categorical test," not "a 'necessarily entails' analysis." Gov't Br. 43, 47; *see also id.* at 44. That is a distinction without a difference. Both the traditional and the *Kawashima* categorical approaches require courts to identify the least culpable conduct that violates state law. *See Shular v. United States*, 589 U.S. 154, 160 (2020). And this Court has affirmed that its interpretation of Oregon's drug delivery statute is binding precedent. *See Cortes-Maldonado*, 978 F.3d at 648 (citing *Sandoval*, 866 F.3d at 990-92).

The government relies heavily on two out-of-circuit cases, but those cases analyze state statutes that criminalize a more limited set of conduct. *See* Gov't Br. 45-46. In *United States v. Penn*, 63 F.4th 1305, 1312 (11th Cir. 2023), the court concluded that a Florida state offense for "attempted transfer of a controlled substance" involved "distributing." And in *United States v. Prentice*, 956 F.3d 295,

---

[5] Although the government characterizes the seminal decision, *State v. Self*, 75 Or. App. 230 (1985), as involving a "promised exchange" with a third-party dealer, Gov't Br. 44, there was "no agreement to accomplish this scheme" and "no facts indicating the third party's willingness to perform the promised criminal acts." *Sandoval*, 866 F.3d at 990-91. The defendant did not, as the government argues, set up "all steps leading to *the ultimate transfer*." Gov't Br. 46 (emphasis added; cleaned up)).

298-300 (5th Cir. 2020), the court concluded that a Texas state offense for "possession with intent to deliver" involved "distributing." Bare solicitation under Oregon law, however, "does not constitute 'attempted' delivery," *Sandoval*, 866 F.3d at 989, and is not "the same as the crime of possession with intent to deliver a controlled substance," *Cortes-Maldonado*, 978 F.3d at 652. This Court and others—in opinions the government ignores—have made clear that conduct with only a tenuous connection to distribution or manufacturing does not qualify as an ACCA predicate. *See United States v. Davis*, 806 F. App'x 572, 574 (9th Cir. 2020); *United States v. Fields*, 53 F.4th 1027, 1051 (6th Cir. 2022).

The government concludes by arguing that "this Court has affirmed distribution convictions where a defendant set up (but did not complete) contraband sales." Gov't Br. 48 (citing *United States v. McElmurry*, 776 F.3d 1061 (9th Cir. 2015)). But the child pornography distribution statute addressed in *McElmurry*, 18 U.S.C. § 2252(a)(2), *does* require the completed act of distributing, even if the defendant does not participate in it directly. As this Court noted, even if a defendant "does not possess" child pornography, he "nevertheless distributes" if he "brought about [another]'s distribution." *McElmurry*, 776 F.3d at 1064. The defendant in *United States v. Ahumada-Avalos*, 875 F.2d 681 (9th Cir. 1989), *see* Gov't Br. 43, 47-48, similarly "participat[ed] in the sale and distribution of [drugs]," including "arrang[ing] for delivery of the drugs, ma[king] phone calls

24

negotiating the price, amount, place of delivery, and payment, and travel[ing] in furtherance of the crime." 875 F.2d at 682-83; *see also id.* (noting "the actual transfer of the drugs").

In short, only "*serious* drug offenses" qualify as predicates under the ACCA, not *all* drug offenses. Bare solicitation—conduct with only a tenuous connection to distribution—does not qualify as such an offense.

### C. The District Judge Did Not Consider The Margin Of Error In Approximating Unseized Drug Quantities

In approximating the quantity of unseized pills containing fentanyl analogue, the district court concluded that the offense conduct involved at least 2,766 unseized pills, which resulted in a total of 2,858 pills (or 300 grams). That finding created a small margin of error as 300 grams was "barely above the amount that would have led to a significantly lower sentencing range." *United States v. Scheele*, 231 F.3d 492, 499 (9th Cir. 2000). Judge Immergut then failed to consider that small margin of error and erroneously concluded that "[a]ll the evidence" demonstrated that Hunt distributed fentanyl analogue. 1-ER-104. Because the evidence showed that the untested pills varied in color, markings, strength, and price, Judge Immergut erred in approximating the quantity of unseized pills containing fentanyl analogue. Opening Br. 43-47.

The government tries to muddle the record to suggest evidence supports a finding that *all* 2,766 unseized pills (290.8 grams) contained fentanyl analogue.

Gov't Br. 38-40. That is incorrect. The government only tested a sample of the 92 seized pills, which were marked either "A 214" or blue "E 8." PSR ¶ 28; *see* 3-SER-596 (exhibit). Riley Jones did not testify regarding the appearance of the 2,000 pills she received, and record evidence showed that some unknown portion were pills with an "'M' in a square on [one] side and [a] '30' on [the] other [side]" that were "doing nothing" for her father. 4-ER-745 (text message); 3-SER-597 (exhibit); 3-SER-533. Hill similarly testified that she received "some white pills" that "must have been sugar pills or something" as "[t]hey had nothing in them at all." 4-ER-755. And even the government's expert testified that during the relevant period, there was "no set recipe for any of this stuff," there was "a wide variety of different strengths and quantities," and "you didn't know what was going in" the counterfeit pills. 4-ER-780-81.

Because a preponderance of evidence does not support a finding that all unseized pills contained fentanyl analogue, rather than fentanyl, oxycodone, or another substance, Judge Immergut erred in failing to consider the small margin of error in her drug-quantity finding.

\*\*\*

The Court should vacate Hunt's sentence if it does not vacate or reverse the convictions.

**IV.    The Government Fails To Demonstrate That 18 U.S.C § 922(g)(1) Is Constitutional As Applied To Hunt, A Non-Violent Offender**

Hunt's convictions for unlawful possession of a firearm are unconstitutional as applied to him.  Opening Br. 37-39.  In the opening brief, Hunt primarily relied on this Court's then-recent decision in *United States v. Duarte*, 101 F.4th 657, 661 (9th Cir. 2024), which held that 18 U.S.C. § 922(g)(1) was unconstitutional as applied to a non-violent offender like Hunt.  Subsequently, the Supreme Court decided *United States v. Rahimi*, 144 S. Ct. 1889 (2024).

Consistent with *Duarte*'s analytical approach, *Rahimi* broadly reaffirmed the "historical tradition" test set forth in *New York Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1 (2022), and narrowly held that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment."  144 S. Ct. at 1903.  In upholding the restriction at issue, *Rahimi* noted (i) two specific legal regimes dating back to the founding era, *id.* at 1901; (ii) that the statute at issue requires judicial determinations that a defendant "represents a credible threat to the physical safety of another," *id.* at 1901-02 (cleaned up); and (iii) that disarmament "was temporary," *id.* at 1902.  *Rahimi* also rejected the argument that a person who is not "responsible" could be disarmed.  *Id.* at 1903.  Shortly thereafter, this Court granted en banc review in *Duarte*.  108 F.4th 786 (9th Cir. 2024).

27

The government tries to turn back the clock to this Court's pre-*Bruen* decision in *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010). Gov't Br. 56-59. But as the *Duarte* panel correctly ruled, *Vongxay* is "clearly irreconcilable with *Bruen*." *Duarte*, 101 F.4th at 661. The government's other arguments also fail.

The government fails to put forward any meaningful discussion of a "historical analogue" as required under *Bruen*. *See Rahimi*, 144 S. Ct. at 1903. Instead, it attacks a strawman, arguing that "a person may not obtain an as-applied exemption from § 922(g)(1)" because such challenges "distor[t] the separation of powers by allowing the courts to usurp Congress's role in deciding the rigor and severity of the criminal code and the Executive Branch's role in deciding when to make exceptions and grant clemency." Gov't Br. 56. But that is exactly the type of "judicial deference to legislative interest balancing" expressly rejected by *Bruen*. 597 U.S. at 26. The Second Amendment requires courts to craft rules consistent with its commands.[6]

The government's argument that "felons were not among 'the people' covered by the Second Amendment when it was adopted" is also misplaced. Gov't Br. 57. In a pre-*Rahimi* decision, this Court determined that pre-trial detainees are

---

[6] The government's assertion that Hunt's challenge is barred because he was on supervised release is also wrong. Gov't Br. 57 (citing *United States v. Gay*, 98 F.4th 843, 847 (7th Cir. 2024), and *United States v. Dorsey*, 105 F.4th 526, 532 (3rd Cir. 2024)). Neither of the two out-of-circuit cases cited by the government apply the two-step *Bruen* framework nor provide any historical basis to conclude that a person on supervised release has lesser Second Amendment rights.

among the people, *see United States v. Perez-Garcia*, 96 F.4th 1166, 1180 (9th Cir. 2024), and the government's position amounts to a repackaging of an argument—rejected in *Rahimi*—that only "responsible" citizens fall under the Second Amendment's guarantees. *See* 144 S. Ct. at 1903.

In any event, should the Court not otherwise vacate Hunt's § 922(g)(1) convictions, it should reserve judgment on this issue in light of the now pending en banc decision in *Durate*.

## CONCLUSION

The Court should vacate the judgment of conviction and remand for further proceedings before a different judge. *See United States v. Feldman*, 983 F.2d 144, 145 (9th Cir. 1992).

Respectfully submitted,

/s/ Raymond D. Moss

JONATHAN S. SACK
RAYMOND D. MOSS
 *Counsel of Record*
MORVILLO ABRAMOWITZ
 GRAND IASON & ANELLO PC
565 Fifth Avenue
New York, NY 10017
(212) 856-9600
rmoss@maglaw.com

*Counsel for Appellant*

December 4, 2024

29

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-2342

I am the attorney or self-represented party.

**This brief contains** | 6,866 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [ ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Raymond D. Moss | **Date** | December 4, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*