**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 23-2342 |
| *Plaintiff - Appellee*, | D.C. No. 3:18-cr-00475-IM-1 |
| v. | |
| DONTAE LAMONT HUNT, | |
| *Defendant - Appellant*. | OPINION |

Appeal from the United States District Court
for the District of Oregon
Karin J. Immergut, District Judge, Presiding

Argued and Submitted March 31, 2025
Portland, Oregon

Filed August 27, 2025

Before: Morgan B. Christen and Kenneth K. Lee, Circuit
Judges, and Cathy Ann Bencivengo, District Judge.[*]

Opinion by Judge Lee

---

[*] The Honorable Cathy Ann Bencivengo, United States District Judge
for the Southern District of California, sitting by designation.

2                           USA v. HUNT

## SUMMARY[**]

### Criminal Law

The panel affirmed the district court's orders denying
Dontae Hunt's motion to suppress, and his recusal motion,
in a case in which Hunt was convicted of possession with
intent to distribute fentanyl analogue, conspiracy to possess
with intent to distribute and to distribute a controlled
substance, unlawful possession of firearms, and laundering
of monetary instruments.

The abandonment doctrine states that a person who
abandons property relinquishes his expectation of privacy in
that property and thus waives any Fourth Amendment
challenge.

Addressing how to apply the abandonment doctrine to
digital devices that may contain a massive trove of personal
information, the panel declined to scuttle the doctrine when
it comes to cellphones. The panel followed the time-tested
reasonable expectation of privacy principle while
considering that today's technology allows us to keep
historically unprecedented amounts of private information in
devices. When determining a person's intent to abandon,
courts should analyze the intent to abandon the device
separately from the intent to abandon its data.

Disagreeing with the district court's ruling that Hunt
lacked standing to challenge the search of an iPhone he
dropped after being shot five times, the panel held that the

---

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

district court erred when it held that Hunt abandoned his privacy interest in the phone. The record does not allow the inference that Hunt intended to abandon the phone or its contents when he dropped it after being shot; it shows that he fled to seek medical help.

The panel held that Hunt's Fourth Amendment claim fails on the merits because federal agents obtained a warrant and searched his phone within a reasonable period.

The panel rejected Hunt's argument that the district court judge should have recused herself because she served as the U.S. Attorney in Oregon when her office earlier prosecuted Hunt for a different crime. A reasonable person would not question the district court judge's impartiality.

The panel rejected Hunt's other challenges in a concurrently filed memorandum disposition.

## COUNSEL

Suzanne Miles (argued), Assistant United States Attorney, Criminal Appellate Chief; Peter D. Sax, Gary Y. Sussman, and Sarah Barr, Assistant United States Attorneys; Natalie K. Wight, United States Attorney; Office of the United States Attorney, United States Department of Justice, Portland, Oregon; for Plaintiff-Appellee.

Raymond D. Moss Jr. (argued) and Jonathan S. Sack, Morvillo Abramowitz Grand Iason & Anello PC, New York, New York, for Defendant-Appellant.

Jennifer S. Granick, American Civil Liberties Union Foundation, San Francisco, California; Nathan F. Wessler

USA v. HUNT

and Brett M. Kaufman, American Civil Liberties Union
Foundation, New York, New York; Kelly Simon, American
Civil Liberties Union Foundation of Oregon, Portland,
Oregon; Andrew Crocker and Hannah Zhao, Electronic
Frontier Foundation, San Francisco, California; Jake
Wiener, Electronic Privacy Information Center,
Washington, D.C.; for Amici Curiae American Civil
Liberties Union, ACLU of Oregon, Electronic Frontier
Foundation, Electronic Privacy Information Center, and
National Association of Criminal Defense Lawyers.

## OPINION

LEE, Circuit Judge:

The abandonment doctrine states that a person who
abandons property relinquishes his expectation of privacy in
that property and thus waives any Fourth Amendment
challenge.  But how should we apply the abandonment
doctrine to digital devices that may contain a massive trove
of personal information?  Appellant Dontae Hunt and *amici*
urge us to scuttle this doctrine when it comes to cellphones.

We decline to do so.  We follow the time-tested
reasonable expectation of privacy principle while
considering that today's technology allows us to keep
historically unprecedented amounts of private information in
devices.  When determining a person's intent to abandon,
courts should analyze the intent to abandon the device
separately from the intent to abandon its data.

We disagree with the district court's ruling that Hunt
lacked standing to challenge the search of his black iPhone.

The record does not allow the inference that Hunt intended to abandon the phone or its contents when he dropped it after being shot five times; it shows that he fled to seek medical help. Hunt's Fourth Amendment claim fails on the merits because federal agents obtained a warrant and searched his phone within a reasonable period.

We also reject Hunt's argument that the district court judge should have recused herself because she served as the U.S. Attorney in Oregon when her office earlier prosecuted Hunt for a different crime. A reasonable person would not question the district court judge's impartiality. We affirm the conviction and the sentence.[1]

## BACKGROUND

### I. Dontae Hunt drops his black iPhone as he gets shot five times.

One early morning in December 2017, Dontae Hunt was talking on his black iPhone as he strolled by his apartment parking lot. A gunman suddenly appeared, firing a fusillade of bullets at Hunt. Shot five times, Hunt dropped his black iPhone and his Gucci satchel. Hunt's girlfriend had accompanied him and immediately called a female friend to help take Hunt to a nearby hospital. The girlfriend took Hunt's satchel (which had fallen on the parking lot) but left his black iPhone (which was near some shrubs). The two women dropped Hunt off at the emergency room and left.

The two women, however, did not make it far. The police pulled the pair over for a traffic violation. During the traffic stop, an officer spotted a brown Gucci satchel bag,

---

[1] We reject Hunt's other challenges in a concurrently filed memorandum disposition.

6 USA v. HUNT

covered in blood, laying on the passenger floorboard. Inside the bag the officer found two handguns. Hunt's girlfriend admitted the Gucci bag belonged to Hunt but denied knowing the bag contained the handguns.

Eugene police next went to the hospital to speak with Hunt about the shooting. The officer found Hunt at the hospital in "substantial pain." Hunt refused to speak to the officer. When the officer asked Hunt "if he wanted the police to find out who shot him," Hunt replied "no" and said that "he was alright." Before leaving the hospital, the officer seized Hunt's clothing and another iPhone—a white one—as evidence associated with the shooting. The officer gave Hunt a receipt for both the clothing and the white iPhone.

Police visited the crime scene, where they found a black iPhone near some shrubs a short distance from the shooting location. The police took it into evidence as part of their investigation into the shooting. No one ever came looking for the phone, so it remained in evidence for over two years until an unrelated investigation into a Portland overdose death triggered police interest in the device.

## II. The federal government starts a separate drug investigation.

The overdose investigation, conducted by the Portland Police Bureau and several federal agencies, identified a woman who sold counterfeit oxycodone pills to the deceased. She declined to identify her supplier by name but gave the police the supplier's cellphone number. Relying on this informant, the police obtained a geolocation warrant for the registered cellphone owner, a woman who (the police later discovered) worked for Hunt. In its affidavit in support of the geolocation warrant, the police, however, failed to disclose that this informant had a criminal history of lying to

the police.  Nonetheless, the geolocation warrant ultimately yielded additional evidence, leading the police to focus on Hunt and to conduct an in-person surveillance of him.  The police noted that Hunt engaged in peculiar behavior common to drug dealers trying to evade detection from law enforcement.  For example, he made well over a dozen Walmart cash transfers using different phone numbers.  The mother of his children rented seven cars over four months, and Hunt drove a Chevy Silverado paid for in cash by a person with no links to Hunt.  The investigation also turned up evidence of Hunt's past drug dealing convictions.  And a second confidential informant, with no criminal record or known relationship to the first informant, told police that Hunt continued to sell drugs and "store[] cash at residences belonging to female acquaintances."

Federal agents used this information to obtain a premises search warrant for three residences associated with Hunt, including a home on Portland's Dekum Street.  During the raid on the Dekum residence, police found counterfeit fentanyl pills, firearms, and Hunt—barricaded in a bathroom and allegedly flushing pills down the toilet.

### III. The government uses data from Hunt's black iPhone to help convict him on drug-trafficking and other charges.

The story comes full circle when federal agents filed an affidavit in January 2020 to search several electronic devices, including the black iPhone found at the scene of Hunt's shooting and held by the local police.  At the time, federal agents still lacked confirmation that the black iPhone belonged to Hunt, though they suspected so because police "found [it] on the ground where [Hunt] was shot."  The

8 USA v. HUNT

search of the black iPhone produced more evidence of Hunt's drug dealing activities.

Based on evidence from the searches of the Dekum residence and the black iPhone, prosecutors charged Hunt with several crimes, including possession with intent to distribute fentanyl analogue, conspiracy to possess with intent to distribute a controlled substance, unlawful possession of a firearm, and laundering of monetary instruments. The case eventually landed on Judge Immergut's docket.

Before the trial, Hunt moved for Judge Immergut's recusal. Over fifteen years earlier, Judge Immergut had served as the U.S. Attorney for the District of Oregon when that office prosecuted Hunt for unrelated charges. In that case, the district court had sentenced Hunt to twenty years, but his sentence was commuted after thirteen years. Judge Immergut declined to recuse herself. She explained, "I have no personal bias or prejudice against Defendant Hunt. Nor do I have any personal recollection of Defendant Hunt or the facts underlying his prior 2005 conviction." Judge Immergut presided over the trial, which ultimately led to Hunt's conviction.

## STANDARD OF REVIEW

This court reviews de novo a district court's denial of a motion to suppress. *United States v. Yang*, 958 F.3d 851, 857 (9th Cir. 2020). We review the district court's factual findings, including those factual findings related to abandonment, for clear error. *See id.* at 858*; see also United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986). For recusal orders, we review for abuse of discretion. *United States v. McTiernan*, 695 F.3d 882, 891 (9th Cir. 2012).

## DISCUSSION

### I.  Judge Immergut did not abuse discretion in denying the recusal motion.

As a threshold matter, we must decide whether Judge Immergut should have recused herself because she served as the U.S. Attorney in Oregon when that office prosecuted Hunt in his earlier 2005 criminal proceedings.  We reject Hunt's argument that she should have done so.

A federal judge must "disqualify [her]self in any proceeding in which [her] impartiality might reasonably be questioned."  28 U.S.C. § 455(a); *see also United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008) (quoting from *id.*).  This provision requires judges "to avoid even the appearance of partiality."  *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988) (quoting *Health Servs. Acquisition Corp. v. Liljeberg*, 796 F.2d 796, 802 (5th Cir. 1986)).  We thus require recusal when "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *Holland*, 519 F.3d at 913 (quotation omitted).

Our circuit precedent does not establish many bright-line rules and requires judges to take a "fact-driven" approach that "may turn on the subtleties" of each case when applying the recusal standard.  *Id.*  For example, in *United States v. Silver*, we applied this fact-driven approach to find that a judge did not need to recuse himself without a "factual connection or relationship between the [] case [before him] and [a ten-year-old] mail fraud" investigation into the defendant that began during the judge's tenure as the United States Attorney.  245 F.3d 1075, 1079 (9th Cir. 2001).  In reaching that holding, *Silver* did not establish a rigid rule that a judge can avoid recusal simply because the prior case lacks

| 10 | USA v. HUNT |
| --- | --- |

a factual relationship to the case before the judge. *See id.*
Rather, both the age of the earlier investigation and the fact
that the judge only needed to consider the prior case for
sentencing purposes contributed to our determination that a
reasonable person would not doubt that judge's impartiality.
*Id.* at 1080.

In contrast, we did impose a bright-line rule in *United
States v. Arnpriester* that a judge cannot decide the *same*
case in which the judge participated in or supervised as the
United States Attorney. 37 F.3d 466, 467 (9th Cir. 1994).
We found categorically that a reasonable person would
question a judge's impartiality in any such situation. *See id.*

The facts of Hunt's case convince us that Judge
Immergut did not abuse her discretion in holding that a
reasonable person would not question her impartiality. First,
as in *Silver*, Hunt's current case has "no factual connection
or relationship" with his prior prosecution. *See* 245 F.3d at
1079. Second, over fifteen years passed between Hunt's first
prosecution and this second case. That stretches beyond the
ten-year gap in *Silver*. *Id.* at 1080. Third, Judge Immergut
served as the United States Attorney, and not as a line
prosecutor. Many similar drug and felon-in-possession
prosecutions likely passed through her office, and Judge
Immergut, as the U.S. Attorney, likely was not directly
involved in these commonplace criminal prosecutions.
Fourth, Judge Immergut stated she did not have "any
personal recollection" of Hunt's 2005 case and has "no
personal bias or prejudice" against him. These facts would
not lead a reasonable person to think that Judge Immergut
had any bias against Hunt. We thus next address Hunt's
Fourth Amendment claim.

## II. Hunt has standing to make a Fourth Amendment challenge because he did not abandon his privacy interest in the black iPhone.

The district court erred when it held that Hunt abandoned the black iPhone and thus lacked standing to challenge the search of the iPhone's data. We, however, reject Hunt and *amici*'s invitation to jettison the abandonment doctrine for digital data. Rather, we follow the reasonable expectation of privacy framework set by the Supreme Court and adapt the abandonment doctrine to account for the unique characteristics of cellphone data. That approach leads us to hold that the abandonment doctrine can apply to cellphone data but courts should analyze the physical phone and its data separately to determine whether the circumstances allow the conclusion that there was an intent to abandon either.

### A. We apply the expectation-of-privacy principle while considering the unique nature of digital devices in applying the abandonment doctrine.

The Fourth Amendment guarantees to the people the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. CONST. amend. IV. The Framers adopted this amendment to guard against the type of abuses they experienced under British rule: It was a "response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Carpenter v. United States*, 585 U.S. 296, 303 (2018) (quoting *Riley v. California*, 573 U.S. 373, 403 (2014)). The Fourth Amendment enshrines the founding generation's goals to protect "'the privacies of life' against

'arbitrary power'" and "to place obstacles in the way of a too permeating police surveillance." *Id.* (citations omitted).

But as digital "technology has enhanced the Government's capacity to encroach upon" traditionally private areas of life, the judiciary has sought to preserve "that degree of privacy against government that existed when the Fourth Amendment was adopted." *Carpenter*, 585 U.S. at 305 (citing *Kyllo v. United States*, 533 U.S. 27, 34 (2001)). To that end, the Supreme Court warns that "[w]hen confronting new concerns wrought by digital technology," courts must be "careful not to uncritically extend existing precedents." *Carpenter*, 585 U.S. at 318.

We follow the model set by the Supreme Court in *Riley*, *Carpenter*, *Jones*, and *Kyllo* and apply reasonable expectation-of-privacy principles to a world where new technology makes possible previously unimaginable and objectionable invasions of privacy.[2] As one leading Fourth Amendment scholar has argued, the Supreme Court's framework for analyzing digital devices advances the "original public meaning of the Fourth Amendment." Orin Kerr, *The Digital Fourth Amendment* 54–56 (2025). It does so by preserving the same balance between the citizenry's right to privacy and the government's power to investigate that existed in the early republic. *See id.* at 57. The founding

---

[2] See *Riley*, 573 U.S. at 385–401 (applying the traditional warrant exception test to cellphone data); *Carpenter*, 585 U.S. at 313 (applying the traditional expectation of privacy in the "whole of [one's] physical movements" to cell-site data); *United States v. Jones*, 565 U.S. 400, 402, 411 (2012) ("What we apply is an 18th-century guarantee against unreasonable searches" to find attaching a GPS tracking advice to a car counts as a search); *Kyllo*, 533 U.S. at 34–35 (applying the traditional expectation of privacy standard in holding that the use of thermal imagining technology can count as a search of a home).

generation always understood the Fourth Amendment to protect a certain degree of privacy and not merely a specific set of rules. *Id.*; *see Kyllo*, 533 U.S. at 34–35.

The Supreme Court in *Riley* highlighted the unique nature of digital devices containing massive amounts of personal data. 573 U.S. 373. The police officers there searched cellphones right after arresting the suspects, and justified these warrantless searches under the search incident-to-arrest exception. The Court, however, refused to extend this warrantless search exception to cellphones, in large part because it recognized the "substantially greater individual privacy interests" associated with the private and detailed data contained in cellphones as opposed to "a brief physical search." *Id.* at 374.[3] That greater privacy interest stems from the vast quantity and intimate quality of the data collected throughout the day and over the years. *Id.* at 393. As the Court wryly remarked, "the proverbial visitor from Mars might conclude [cellphones] were an important feature of human anatomy," given that they "are now such a pervasive and insistent part of daily life." *Id.* at 385.

Cellphones can easily contain over a decade's worth of private photographs, personal text messages to family and friends, every email sent to business associates, voicemails from years ago, and call logs documenting every call received or dialed. The various apps on a phone can also contain a trove of personal information. For example, a

---

[3] The Court also reasoned that rationales justifying a warrantless search incident to arrest—the risk of a suspect hiding a weapon in, say, a satchel or reaching out to destroy evidence in that satchel—do not apply to digital data. *See* 573 U.S. at 386. The Court, however, recognized exigent circumstances could still allow a warrantless search of digital devices. *Id.* at 391.

search of web-browsing history may reveal intimate details of "an individual's private interests or concerns." *Id.* at 395. A medical-related app may disclose private health information or prescription history. And a financial app can divulge purchases made on a credit card, bank balances, credit scores, and an individual's net worth. Indeed, a cellphone's ability to store vast data likely allows the government to learn more about the cellphone's owner than would a search of the person's entire home or every piece of mail received. *Id.* at 396–97.

In our case, we must decide how to apply the abandonment doctrine—a well-established exception to the Fourth Amendment's prohibition against a warrantless search and seizure—to cellphones. The abandonment doctrine holds that a person forfeits a reasonable expectation of privacy by voluntarily abandoning property. *United States v. Fisher*, 56 F.4th 673, 686 (9th Cir. 2022). Abandonment goes to intent. *Nordling*, 804 F.2d at 1469. A person shows an intent to abandon a privacy interest when, given the totality of the circumstances, by "words, acts or other objective indications, [the] person has relinquished a reasonable expectation of privacy in the property at the time of the search or seizure." *Id.* (citation modified). We ask what "words, acts or other objective indications" would reveal a person's intent to voluntarily abandon any expectation of privacy in the property. *See id.*

Following the Supreme Court's framework, we apply the abandonment doctrine to cellphones while accounting for the unique aspects of cellphone data. Someone who loses her cellphone through theft or negligence likely does not intend to release to the public details of her personal life any more than someone who loses a house key intends to invite the public to rummage through her home. *See Riley*, 573

U.S. at 397. That house key analogy proves particularly instructive when thinking about abandonment because the house key and the house provide the closest pre-digital functional analogue to the cell phone and its data. *See* Kerr, *supra* at 65. The analogy confirms that just as courts historically would apply the reasonable expectation of privacy principle separately to a house key and the contents of a house, courts today may need to distinguish a digital device from the data it contains to preserve the degree of privacy that existed at the time of the Fourth Amendment's adoption. *Id.* Based on the specific facts of each case, courts should analyze the intent to abandon the device separately from the intent to abandon its data—and not reflexively conflate the two.

In *Fisher*, the Ninth Circuit's most analogous case, two defendants hid a cellphone and two hard drives with incriminating information between the insulation and wood framing of an attic. 56 F.4th at 681. While in custody, the defendants sold the house with the devices still hidden in the attic. *Id.* The court held that the defendants had abandoned the devices when they did not recover them "*before* the home was sold." *Id.* at 687 (emphasis in original). Having intentionally left their devices in the home and then sold the house knowing that the devices remained there, the defendants abandoned the devices and their data. *Id.*

## B. Hunt did not abandon the black iPhone or its data.

Hunt's actions do not suggest an intent to abandon his black iPhone or its data. The district court committed clear error by finding otherwise. The serious injuries caused by the shooting—and the traumatic and chaotic atmosphere after—suggest that Hunt likely dropped the black iPhone and

did not intend to leave it behind. Considering the circumstances, Hunt likely only intended to get medical attention and flee from the shooter as soon as possible without thinking or even knowing what happened to the phone. This is distinguishable from the situation in *Fisher*, where the Ninth Circuit found that the defendants—who sold their house even though they knew that it contained a cellphone and two hard drives in its attic—forfeited their privacy interest in the devices and their content. *See* 56 F.4th at 687.

The district court acknowledged that Hunt "may have dropped the phone in the course of being shot or fleeing," but reasoned that after the shooting, Hunt made no "apparent effort to secure the black iPhone." But the iPhone was later found in the bushes and not plainly visible. Most people would not scour the bushes after a shooting to find a phone (assuming that Hunt even realized he had lost or dropped the phone after being shot).

The government also argues that Hunt abandoned the black iPhone and its data by not trying to retrieve the phone from the police. That is an important fact in assessing intent, but there is no indication that Hunt realized that he left the missing phone at the shooting scene for at least three reasons. First, Hunt claims to not remember the shooting, so he might not have known that he used the black iPhone at the time and that the police had it. Second, the police officers seized the white iPhone from Hunt's person and gave him a receipt for it, such that Hunt could have reasonably expected the police to give him a receipt for the black iPhone if they also had it. The police, however, did not provide a receipt for the black iPhone. Third, Hunt reasonably could have concluded that someone other than the police picked up a valuable iPhone in a public parking

lot. We thus hold that the district court clearly erred in finding that Hunt intended to abandon the black iPhone, and it logically follows that he did not intend to abandon the data in it.

Even if we assume that Hunt had abandoned his black iPhone by not trying to retrieve it from the police, we cannot conclude that he also intended to abandon the data in his phone without examining all the relevant facts. Unlike the defendants in *Fisher*, Hunt did not willingly sell or give away his black iPhone with all its personal data still intact. *See* 56 F.4th at 687. Rather, he simply lost the phone during a shooting. Though he did not follow up with the police, the record does not establish that he had reason to suspect the police collected the black iPhone from the crime scene. We need not conduct a separate analysis of the stored data because we hold that Hunt did not abandon his phone.

**III. The government did not violate Hunt's Fourth Amendment rights because it obtained a warrant to search the phone and did not hold it for an unreasonable period.**

While Hunt has standing to challenge the search of the black iPhone's data, his argument fails on the merits. Federal agents obtained a warrant to search the iPhone's data. So Hunt can only complain that the government violated the Fourth Amendment by seizing the data for an unreasonably long period. This argument falls flat because the Eugene police acted reasonably by collecting the iPhone as evidence related to the shooting investigation and by holding it until someone claimed it.

The Fourth Amendment prohibits unreasonable searches and seizures. *Soldal v. Cook County*, 506 U.S. 56, 61 (1992) (citation modified). The Court, however, has recognized

18            USA v. HUNT

that "special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like" may make a warrantless seizure reasonable. *Illinois v. McArthur*, 531 U.S. 326, 330 (2001). But "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests." *United States v. Jacobsen*, 466 U.S. 109, 124 (1984). To remain reasonable, a seizure must last "no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant" to search the property. *McArthur*, 531 U.S. at 332; *see also United States v. Sullivan*, 797 F.3d 623, 633 (9th Cir. 2015).

To decide whether a prolonged seizure remained reasonable, we balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Sullivan*, 797 F.3d at 633 (citation omitted). The balance here favors the government.

Given that Hunt lost his iPhone and never sought to recover it, the Eugene police's intrusion upon his possessory interest was minimal at best. *See id.* (finding owner's inability to use a device reduced his possessory interest in the device)*.

On the other side of the ledger, the Eugene police had a legitimate law enforcement reason to seize the black iPhone as evidence for its investigation into the shooting. While the iPhone might have belonged to a random passerby, its proximity to the site of Hunt's shooting gave police a basis to suspect the iPhone could help identify the shooter, an accomplice, or a witness. The police thus acted reasonably by seizing the iPhone during the initial sweep of the parking lot.

Moreover, police had a legitimate law enforcement reason to retain the iPhone after its initial collection simply because it represented lost property with no identified owner to whom the police could return it. Multiple state supreme court cases note that the police often retain lost or mislaid property in secure locations until the authorities can identify the owner. *See State v. Hamilton*, 67 P.3d 871, 875 (Mont. 2003); *State v. Ching*, 678 P.2d 1088, 1093 (Haw. 1984); *see also State v. Kealey*, 907 P.2d 319, 325 (Wash. Ct. App. 1995), *as amended on denial of reconsideration* (Feb. 26, 1996). Here, the record does not suggest that the Eugene police did anything with the black iPhone other than hold it in evidence.

## CONCLUSION

We **AFFIRM** the district court's orders denying Hunt's motion to suppress and his recusal motion.